# DON CORN
*v.*
## DEPARTMENT OF REVENUE

David F. P. Guyett, Bend, represented plaintiff.

Glen V. Sorensen, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered April 3, 1978.

CARLISLE B. ROBERTS, Judge.

The plaintiff, Don Corn, appealed from the defendant's Order No. VL 77-198, dated May 26, 1977, respecting the January 1, 1976, true cash value of a one-half acre lot near Bend, Oregon. The lot, identified in the county assessor's records as Assessor's Account No. 17 12 17C 901, was placed on the 1976-1977 tax roll by the assessor at $9,580. Upon appeals by plaintiff, this value was affirmed by the Deschutes County Board of Equalization and the Department of Revenue. At the trial, the plaintiff contended that the value of the lot did not exceed $4,000. The issue presented to this court is whether the lot should be valued as a buildable lot, as maintained by the county assessor, or as an unbuildable lot, as maintained by plaintiff.

The court viewed the subject property, the southern boundary of which runs to the center of the Deschutes River. The lot is extremely rocky, with a steep cliff which drops approximately 100 feet to the river. On the northern end of the lot, there is a narrow draw about 20 feet wide. The lot rises from this draw approximately 30 feet to a bluff overlooking the river. The major portion of this bluff is fractured lava rock, with numerous fissures and crevices. A tubular cave

penetrates under the bluff from the cliff wall for a distance of some 20 to 30 feet. From the bluff overlooking the river, there is an excellent view of the Deschutes River, both upstream and downstream, as well as a view of the Cascade Mountains.

Plaintiff, who also owns Tax Lot 1000, which borders the subject property on the north and east, purchased the subject property from Clarence H. White on December 13, 1974, after extensive negotiations. The contract of sale stated a price of $4,000 and provided for a $50 down payment and ten annual payments of $400 ($50 to principal and $350 to interest), with the remaining principal balance due with the tenth annual payment. At the time he purchased the lot, plaintiff understood that it was unbuildable.

Plaintiff purchased the subject property in order to use its narrow draw for a sewage drain field for his house, which, at the time, was under construction east of the subject on Tax Lot 1000. Plaintiff had originally planned on locating the drain field on Tax Lot 1000. However, plaintiff's domestic waterline ran through the only suitable location for a drain field on Tax Lot 1000 and the county would not allow a drain field in the same area as the domestic waterline. The county approved the draw as a drain field site and, presently, there is a drain field in the draw which serves plaintiff's house on Tax Lot 1000. There is no other suitable location for a drain field on the subject property.

The subject property also has domestic water supply problems. Unlike Tax Lot 1000, the subject property has no right to irrigation water, which could be treated and used for domestic purposes. It is questionable whether or not a well could be drilled on the subject property, since the county will not allow a well within 100 feet of a septic system. Even if a well were possible, it would be a very expensive undertaking. The well would likely have to be at least 600 feet deep

[ 409 ]

and would have to be drilled through solid rock at a cost of about $20 a foot.

■ Plaintiff testified that access to the lot presents another obstacle to development. The lot is landlocked, in the sense that it does not border on any public road. If the lot were to be sold for development, the purchaser would have to acquire an access easement, either from plaintiff or another adjacent landowner. The need to acquire such an easement would reduce the lot's appeal and value in comparison to other lots for which such an easement would not be required. However, plaintiff indicated that the acquisition of such an easement would not be the end of the access problems.

Any possible access route to a potential building site on the subject property is obstructed by substantial rock outcroppings. A vehicular access route across the rock outcroppings would be impossible without extensive blasting and excavation work. Mr. Kenneth Glantz, the Deschutes County Building Administrator, in charge of the county Building Department, testified as to the cost of such an effort. Mr. Glantz has over 40 years of experience in the construction industry and has had considerable experience in estimating the cost of excavation work, including blasting. He testified that the cost of blasting access to the subject property would be $7,000 to $10,000. This estimate did not include the cost of acquiring an easement across adjoining property.

Mr. Glantz also testified regarding the subject property's potential for development. Mr. Glantz personally inspected the subject property prior to April 1977, and testified that he felt the lot is virtually impossible to build upon. Mr. Glantz candidly stated that, without question, present construction technology would enable a substantial structure to be constructed on the subject lot, but the cost would be prohibitively expensive. He testified that, since buildings cannot be constructed over a drain field, the only

possible building site on the subject property is the fractured rock bluff overlooking the river. Mr. Glantz seemed more concerned with the constant crumbling of the rock, which would cause a foundation to shift and crack, than with the ability of the bluff to support the weight of a structure. Although it would be possible to stabilize the bluff by pumping concrete into all the fissures and crevices, Mr. Glantz stated that such a process would be very expensive. He felt such a task would be undertaken by a contractor only on a cost-plus basis, but his best guess as to the cost of filling the fissures with concrete was $50,000 to $100,000. It was Mr. Glantz's opinion that the subject property could presently be developed only with the expenditure of great sums of money and that it is not economically feasible to develop the subject property at the present time.

The defendant's witness, Mr. Raymond Bennett, the county assessor, presented an appraisal based upon the sale of five properties which he felt were comparable to the subject property. Mr. Bennett identified his appraisal as a review appraisal and indicated that the original January 1, 1976, appraisal had been done by Mr. Darwin Clark, who has since retired from the county assessor's staff. He stated that he had inspected the subject property, had researched the comparable sales, and had spoken with an architect.

The county sanitarian had advised Mr. Bennett that the drain field on the subject property was adequate and that two additional fields could be located on Mr. Corn's other lot, Tax Lot 1000 (apparently in contradiction of the county's requirement respecting proximity of drain fields and domestic water lines). Therefore, Mr. Bennett concluded that the subject property had no sewage disposal problems. On the basis of his conversation with an architect, who had neither viewed the property nor seen pictures of it, Mr. Bennett concluded that the lot was buildable. With these two conclusions in mind, Mr. Bennett valued the subject property as of January 1, 1976, at

$10,200, with an allocation of $9,000 to the land and $1,200 to the drain field.

Mr. Bennett relied on the market approach to value in making his appraisal of the subject property. All of his sales were along the Deschutes River in the same general area as the subject property. In order to compare the sale properties to the subject property, Mr. Bennett adjusted the sales prices to reflect the different dates of sale, the lack of water on the subject property, the lack of surfaced road access to the subject property, the extra building preparation costs for the subject property, and the differences in location and view. Mr. Bennett stated that, after adjustments, the sales indicated a raw land value for the subject property as of January 1, 1976, of $9,000, to which he added $1,200 for the drain field.

Three of the adjustments made by Mr. Bennett and the addition for the drain field are of critical concern in this case. Since each of the comparable sales had a domestic water supply, Mr. Bennett subtracted $1,750 from the sales price of each lot to allow for the absence of a domestic water supply on the subject property. The $1,750 figure was the county's typical allowance for domestic water to rural dwellings. The figure represented the cost of constructing a cistern. In his adjustment, Mr. Bennett apparently gave no consideration to the absence of a source of water for the cistern. Unlike Tax Lot 1000, the subject property does not have an independent irrigation right; however, Mr. Bennett simply assumed that the subject property would benefit from and use Tax Lot 1000's irrigation water right. Even if such water could not be used, Mr. Bennett felt it would be possible to haul water to the subject property. He knew of three companies in the Bend area engaged in the business of hauling domestic water to rural dwellings.

■■■ Mr. Bennett's assumption respecting the irrigation water is improper. The county's theory is essentially that, since Mr. Corn owns both Tax Lot

1000 and the subject property, any advantages or amenities enjoyed by one of the lots automatically is transferred to the other lot as well. Such a theory is completely inappropriate when valuing the subject property as an independent parcel subject to sale in the market. The whole concept of value is based on what a willing buyer would pay a willing seller for a particular piece of property (in this case, the subject property). In determining this value, Mr. Bennett is including a water right which is a part of Tax Lot 1000, not the subject property. If a potential purchaser of the subject property were aware that domestic water would have to be hauled to the property, the court is convinced that such a purchaser would insist on a reduction in the price of the property. In either case, Mr. Bennett's $1,750 adjustment is unrealistic and inadequate.

██ Mr. Bennett's adjustments for access and building preparation costs are equally inadequate. His $1,200 adjustment for access to the subject property represented the county's typical allowance for road surfacing costs for a lot in a subdivision. This adjustment made no allowance for the acquisition of an access easement and made no allowance for the blasting and excavation that would be required to effectuate access. Mr. Bennett stated that he felt such adjustments were inappropriate since it is the county's position that when two adjacent parcels are in the same ownership, as in this case, and there is existing access to one of the parcels, access is automatically available to the other parcel regardless of any physical barriers to such access or the landlocked nature of the parcel. This position is improper for the same reasons that it was improper to assume that the subject property would automatically be able to use the irrigation water from Tax Lot 1000. What Mr. Bennett has done, in fact, is to include in the value of the subject property a nonexistent easement over Tax Lot 1000, which easement would have to be separately purchased from Mr. Corn in order to gain access to the

subject property. This is true whether the purchaser intends to drive across Tax Lot 1000 and park on the subject property or park on Tax Lot 1000 and walk to the subject, as suggested by Mr. Bennett. The need to purchase such an easement and engage in extensive excavation would influence a potential purchaser to reduce the amount of any offer for the subject property.

Mr. Bennett estimated that $2,000 would be the cost of making the subject property physically buildable. Based on the testimony of Mr. Glantz, the court finds that Mr. Bennett's $2,000 allowance for building preparation costs is far below what it would actually cost to prepare the subject property for building. The adjustment also fails to consider the extra costs entailed in the elaborate design and construction methods envisioned by Mr. Bennett in order to develop the subject property.

■ Mr. Bennett's $1,200 addition to the value of the raw land, to reflect the existence of the drain field, is also questionable. The drain field serves a residence on a different tax lot and the court cannot see that the drain field would be of any value to a potential purchaser of the subject property. The existence of the drain field and its complete utilization in conjunction only with the residence on the adjoining tax lot present problems to a potential purchaser because there is no other suitable location on the subject property for a drain field.

Defendant's appraisal of the subject property is marked with numerous errors. The court has no confidence in the final estimate of value presented on behalf of the defendant. Mr. Corn's testimony regarding the true cash value of the subject property constitutes the preponderance of the evidence. The court finds the true cash value of the subject property as of January 1, 1976, to have been $4,000.

The defendant's Order No. VL 77-198, dated May 26, 1977, is set aside and held for naught and the

County Assessor and Tax Collector of Deschutes County shall amend the assessment and tax rolls for 1976-1977 with respect to the subject property as necessary to conform with this decision. If taxes have been paid by the plaintiff in excess of those required by the tax roll as amended, the excess, with statutory interest thereon, shall be remitted to the plaintiff by the Board of County Commissioners of Deschutes County, Oregon, pursuant to ORS 311.806 and 311.812.

The plaintiff is awarded his statutory costs and disbursements.