Karl E. NEUPERT,
David A. Neupert, John F. Neupert,
Peter M. Neupert and Ann Neupert Durfee
*v.*
DEPARTMENT OF REVENUE
*and*
CLATSOP COUNTY,
*Intervenor*
(TC 3784)

John F. Neupert, Miller, Nash, Wiener, Hager & Carlsen, Portland, represented plaintiffs (taxpayers).

Joseph P. Dunne, Assistant Attorney General, Department of Justice, Salem, represented defendant (department).

Intervenor waived participation in the trial.

Decision for plaintiff rendered December 7, 1995.

**CARL N. BYERS, Judge.**

Taxpayers appeal the 1993-94 assessed value of a narrow strip of vacant land in Cannon Beach. The shape of the parcel and the existence of a public easement raise questions of assessment policies in addition to the question of market value.

The subject property, identified as Tax Lot 7700, is 25 feet wide and more than 200 feet long. It extends west from Hemlock Street down to the beach. The subject strip was originally platted as a public right-of-way and is shown on the map as Chena Avenue. The Cannon Beach City Council, by ordinance, vacated its interest in Chena Avenue on May 7, 1993, but retained a 15-foot-wide public-way easement over the entire length of the north side. Taxpayers obtained ownership of the property by virtue of owning the abutting property to the south, which is Tax Lot 500.

Tax Lot 500 is comprised of platted lots 8, 9, 10, 11, 12, 14 and 15. This property was once owned by Oswald D. West, Governor of Oregon from 1911 to 1915. It was improved by a historic log house which was used as a summer home until May 30, 1991, when it was destroyed by fire.

Taxpayers are one of two family groups, the Neuperts and the Drakes, who inherited Tax Lot 500. When the house burned, the two families reconsidered the use of the property. Eventually, the Neuperts purchased the Drakes'

interest and began rebuilding the historic home. In the process, they discovered the existence of the platted but never developed Chena Avenue. Covered by the vines of time and existing vegetation, the owners of Tax Lot 500 had long treated it as part of their property.

The topography of both the subject property and Tax Lot 500 drops approximately 120 feet from Hemlock Street to the beach, with the middle portion being level. Years ago, the residents accessed Tax Lot 500 by a driveway that went from the rear of the house in a southeasterly direction up to Hemlock Street. This driveway was abandoned approximately 40 or 50 years ago, and an access from Pacific Avenue, which comes in from the north of the subject strip, was developed. It was probably about this time that the freestanding garage was constructed. Although the garage is on property north of the subject strip, its entrance encroaches onto the strip. As a result of these circumstances, part of the lawn around the house, part of the driveway, and other uses treated a large portion of the subject property as part of Tax Lot 500.

This picture of idyllic ownership by the sea has two further complicating features. First a surveyor discovered a narrow strip of land that lies along the north side of the subject property. This recently discovered strip is referred to as "no-man's-land," because ownership of various portions of it is in question. Second, the ordinance vacating Chena Avenue provides that the easement over the easterly half of the subject strip can be removed if the owners of "no-man's-land" grant a 15-foot easement across "no-man's-land" at Pacific Avenue. The easement across "no-man's-land" would give the public access from Pacific Avenue to the subject strip and down the westerly half of the subject property to the beach. It would eliminate the public's need to access the strip from Hemlock. The above information is relevant in considering the degree of interest the owners of Tax Lot 500 might have in the subject property.

The issue before the court is the real market value of the subject property as of July 1, 1993.

Taxpayers' evidence indicates that Tax Lot 500 and the home that has been rebuilt thereon is registered on the

National Register as a historic property. The Neupert family is now committed to maintaining the property as a historic property. One of the Neuperts testified that the family has no interest in or need for the subject land because they already have 150 feet of beach frontage with a magnificent view. Although taxpayers acknowledge the subject property affords them access to Tax Lot 500, they maintain that if they did not have that access, they would redevelop the old driveway. Taxpayers estimate that it would cost $10,000 to reestablish the old driveway. Taxpayers' appraiser testified that due to the size, shape, topography, and legal restrictions on the use of the subject property, it would have a market value of between 10 and 20 percent of the value it would have if it could be developed.

The department's appraiser concluded that the highest and best use of the subject property is as part of Tax Lot 500. He testified that taxpayers could use the easement area to meet area and setback requirements for buildings. He also testified that the subject property maintains the "historical configuration" of Tax Lot 500 by affording additional area for lawn, driveway, and other uses. The department's appraiser felt it is unlikely the easement will be used due to the lack of public parking on Hemlock Street. Further, he concluded that even if it were used, the city would probably develop only a five-foot-wide path. Based on these conclusions and assumptions, the appraiser analyzed the sales of oceanfront lots and found a range of value from $4,509 to $5,179 per front foot. Assuming that the subject property could be added to other property to make a 75-foot-wide lot or a 175-foot-wide lot, he concluded the subject property was worth between $112,730 and $129,480. He then deducted $26,000 as an adjustment for a five-foot easement, resulting in a range of value of $86,730 to $103,480. His opinion of the real market value of the subject property as of July 1, 1993, was $103,480.

Defendant contends it is improper to value Tax Lot 7700 on a stand-alone basis. Due to the increased value that could be gained by combining Tax Lot 7700 with Tax Lot 500, defendant maintains that Tax Lot 7700 should be valued as if it were part of the larger parcel. Because the law in this

area is not without some confusion, it is appropriate to discuss the issue in the context of the statutory scheme.

■■    Ad valorem taxation in Oregon is governed by statute. ORS 308.232[1] requires that real property be assessed at 100 percent of its real market value. ORS 308.215 dictates the assessment roll shall include a description of the property as required by ORS 308.240. ORS 308.240(1) states that the assessor may describe real property by any one of several methods, *e.g.*, lots, blocks, metes and bounds, or by any other method so long as the description is capable of being made certain. Any description that substantially conforms to the requirements of ORS 308.240(1) is sufficient for assessment, levy, collection, foreclosure, and sale. ORS 308.240(3). In addition, ORS 308.245(1) provides:

> "The assessor of each county shall maintain a set of maps upon which are outlined the boundaries of each land parcel *subject to separate assessment* within the county, with the parcel's tax lot or account number shown on the parcel." (Emphasis added.)

■■    Under this statutory scheme, the assessor must establish a separate real market value for each parcel on a stand-alone basis. This is consistent with Oregon's constitutional requirement of uniformity in assessment. Or Const, Art I, § 32. The fact that two contiguous parcels may be owned by the same person does not allow the assessor to combine those parcels for purposes of valuation. *Penn Phillips Lands v. Dept. of Rev.*, 255 Or 488, 468 P2d 646 (1976). Likewise, the statutes do not contemplate separate assessments of segments of real property which are not separately owned. *Bear Creek Plaza v. Dept. of Rev.*, 12 OTR 272 (1992). Consequently, the assessor considers the ownership of land only at the description stage, not at the assessment stage. Once a parcel is identified and described for separate assessment, ownership becomes irrelevant for purposes of its valuation. *First Interstate Bank v. Dept. of Rev.*, 306 Or 450, 760 P2d 880 (1988). "No useful purpose could be served by separate descriptions if the parcels, though separately described, were to be grouped in valuation." Clark A. Nichols, *Cooley-The Law of Taxation* 2169 (4th ed 1924).

---

[1] All references to the Oregon Revised Statutes are to the 1993 Replacement Part.

Also, an appeal of the value of a separate parcel can involve only the value of that parcel; the taxpayer need not appeal the value of all contiguously owned lands. *See, e.g., Corn v. Dept. of Rev.*, 7 OTR 407 (1978).

■ Obviously, changes in ownership and use occur over time. Subject to statutory limitations or conditions such as ORS 308.210, it is within an assessor's discretion to change property descriptions to adapt to these changes in land uses and land values. For example, small adjacent tax lots in the same ownership might be combined into a single tax lot which has a higher and better use. However, until that administrative action is taken, separately assessed parcels of land must be valued on a stand-alone basis without regard to adjacent ownerships.

Defendant cites *Stevens v. Dept. of Rev.*, 9 OTR 141 (1982), and *Taunton v. Dept. of Rev.*, 9 OTR 246 (1982), in support of its position that the assessor may value taxpayers' two tax lots as a single unit. In *Stevens*, this court used the department's appraisal, which valued the nine separate tax lots as "part of an entire ownership of 211 acres." *Stevens*, 9 OTR at 144. However, the facts in that case are not clear. The court noted that:

"[T]he property has not been platted and there was no evidence presented to indicate that the property was purchased according to tax lots." *Id.* at 142.

The court concluded that "[b]ecause the property is a single unit, extreme adjustments for access, size and shape are unrealistic." *Id.* at 144. In *Taunton*, there was no disagreement between the parties about valuing separate tax lots as a single unit. Notwithstanding the outcome in each of those cases, to the extent that they indicate separate tax lots under common ownership may be combined for valuation purposes, they are disapproved and should not be viewed as authoritative.

The court notes that *Stevens* cites *Sabin v. Dept. of Rev.*, 270 Or 422, 528 P2d 69 (1974), to support its decision. However, *Sabin* is not inconsistent with a separate assessment of individual tax lots. In *Sabin*, the subject property was a single tax lot, which had a highest and best use as developmental property if subdivided into smaller parcels.

The Supreme Court approved an assessment based upon that highest and best use even though the taxpayer continued to hold the property as a single parcel. That holding is consistent with concluding that once separate tax lots are established they must be valued and assessed separately even though they remain under common ownership. Therefore, "[t]he value of each lot by itself, not as a portion of a larger piece of property, must be assessed." *First Interstate*, 306 Or at 453.

■ The test of real market value is what the market will pay. If the owners of Tax Lot 500 or other abutting property were not interested in the subject property, it would have only speculative value. It is hard to conceive any viable economic use of the subject property which is not associated with adjoining land. The evidence does disclose reasons for the owners of Tax Lot 500 to be interested in the subject property. First, without the subject lot, the owners of Tax Lot 500 would have to create a new access to Hemlock Street by reopening the old driveway, which could cost more than $10,000. Also, it is possible they could not reopen the old driveway. A letter to one of the owners of the property from a civil engineer states that the subsequent improvement and widening of Hemlock Street have "likely eliminated the possibility of using the old roadway in the future." The letter also states that "[a]ny other access along Hemlock Street would be both extremely difficult to obtain permits for and expensive to construct."

The subject property also provides a measure of privacy for Tax Lot 500. Even 10 feet of additional depth is important, particularly since the public way is now established and recognized. In addition, ownership of the subject strip carries with it the possibility of eliminating the easement over the easterly portion. Eliminating the easement over the easterly portion would assure the owners of Tax Lot 500 there would be no public incursions on their privacy from that direction. Thus, there is value to the owners of Tax Lot 500 in owning the subject property because it provides an additional bargaining chip for the family in dealing with the city on the use of Pacific Avenue.

■ When valuing the property, the assessor must take into consideration the restricted use of the property caused

by the easement. ORS 308.235. However, the court cannot accept the department's discount for the easement. Contrary to the appraiser's belief, the court finds that the market assumes the easement will be used to its full extent. The fact that the public has not used it in the past is hardly justification for concluding that the public will not use it in the future. It was only in the past few years that the public right was clearly established. A buyer in the market would assume that the public will use the full 15 feet, rather than five feet.

The court also believes the department's estimate of value is too optimistic. The market will not pay the same amount for property that cannot be developed as it will for property that can be developed. Even assuming that some owners of abutting property are interested in adding to their property, they will not pay the same per front foot as for property with stand-alone development potential. The department's appraiser admitted the market pays less for property that is in excess of the minimum required for a buildable lot, *i.e.*, 75 feet. He testified that market sales reflect a discount of between 50 and 75 percent for footage beyond that required for development.

The presence of an easement requires that the discount be more than 75 percent. Taxpayers' appraiser testified that, based upon the easement and the property's size, topography, and shape, the discount should be 80 to 90 percent. The court finds that an appropriate discount is 80 percent of buildable beachfront value. The court accepts the department's finding of $5,179 per front foot for buildable beachfront property. When this factor is multiplied by the 25-foot frontage of the subject property, the indicated gross value is $129,475. Applying a discount of 80 percent gives an indicated value of $25,895. The court, therefore, finds that the real market value of the subject property as of July 1, 1993, was $25,895. Costs to neither party.