IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| MARY L. LEE, Trustee, | ) | |
| Mary L. Lee Revocable Living Trust, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 190059G |
| | ) | |
| v. | ) | |
| | ) | |
| HOOD RIVER COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

This case is ready for decision after trial on the real market values of two adjacent parcels of land in Hood River.[1]  The tax year at issue is 2018–19.  Kristie N. Cromwell, attorney-at-law, appeared on behalf of Plaintiff.  Testifying for Plaintiff were: Mary Kathleen Heron, a principal broker and Plaintiff's daughter; Linda Phillips, a friend of Ms. Heron and formerly a real estate broker at her firm; and Lewis Moller, a commercial loan broker and developer.  Defendant Brian D. Beebe, Hood River County Assessor, appeared on his own behalf, and Darlene Johnson, an appraiser and finance professor, testified for him.  Plaintiff's Exhibits 1 to 5 were admitted, and Defendant's Exhibits A to G, M, and N were admitted.

## I. STATEMENT OF FACTS

A.      *Overview of Subjects*

The two subject parcels are undeveloped 0.41-acre lots in Hood River's Westside Area, fronting Rocky Road.  (Ex A at 6, 10.)  They are substantially identical.  In 2002, they were partitioned out of a third, larger parcel that includes a 2,904-square-foot home owned by

---

[1] Plaintiff's motion to add an appeal of the parcels' disqualification from farm use special assessment was denied in the court's Order Denying Leave to Amend Complaint, incorporated herein by reference.  The parcels are identified as Accounts 12630 and 12631.

Plaintiff. (*Id.*) The three parcels total almost 5 acres and were under common ownership during the tax year at issue. (*Id.* at 10; Ex B at 1.) They are zoned for residential use. Prior to the tax year at issue, they were under farm use special assessment.

In 2017, Lewis Moller contracted with Plaintiff for the option to buy all three parcels— the subjects and the lot with the house—contingent on his obtaining regulatory approval to make them into a 24-lot planned unit development (PUD). By the time of the pre-application conference with the city in August 2018, the proposed PUD had been reduced to 18 lots due to mandatory easements and arrangements for onsite stormwater retention. (Ex E at 15–17.) Mr. Moller ultimately concluded it was not financially feasible to develop a PUD on the three parcels because the reduced number of saleable lots would not allow him to recoup the high costs of bringing in sewer lines and building mandated half-street improvements (including sidewalks, curbs, and gutters) along Rocky Road and along the third parcel's southern boundary. (*Id.*)

Defendant disqualified the subject parcels from farm use special assessment in August 2018 and set each of their 2018–19 tax roll real market values at $309,000. (Ex 4 at 1–2.) In the prior year, the subjects' tax roll real market values had been $155,000, and their assessed values had been just $143. (*Id.*) For 2018–19, each of the subjects' assessed values was set at $180,150, resulting in a tax increase from $2.20 to $2,722.67 on each property. (*Id.*)

Plaintiff has requested that the subjects' tax roll real market values be reduced from $309,000 to $155,000. (Compl at 6.) At trial, Defendant alleged the roll values were too low and requested they be raised to $384,000.

B.      *Plaintiff's Evidence of Value*

Plaintiff submitted a competitive market analysis prepared by Linda Phillips and dated November 1, 2018, which was during the period when she held a broker's license and worked for

Plaintiff's daughter. (Ex 4.) Ms. Phillips identified four land sales occurring in 2015 and 2016 that she deemed comparable to the subjects. (*Id*. at 5–7.) The four comparables ranged in size from 0.10 to 0.14 acre. (*Id*. at 5.) Three of them were zoned for residential use; one was zoned for commercial or industrial use. (*Id*.) Ms. Phillips did not adjust her comparables' sale prices, which ranged from $80,000 to $150,000, and she did not conclude to a per-square-foot value. (*Id*.) She ultimately determined the "current value" of the subjects was $155,000 per lot, an amount equal to the "recommended list price" contained in her analysis. (*Id*. at 3–4.)

Ms. Phillips was modest about the reliability of her analysis, admitting that she had "very little" training in preparing competitive market analyses and had only held a broker's license for a short time before relinquishing it. Under vigorous cross-examination, she admitted that she was unaware of the relevant assessment date, had not verified or inspected the properties whose sales she used, did not know the lot sizes or slopes of the subjects, and could not recall what made the properties she had chosen similar to the subjects. She distinguished her role as a broker from that of an appraiser; in her words, an appraiser "has knowledge to actually estimate value," whereas a broker "just gives an opinion."

Defendant's appraiser, Dr. Johnson, testified in rebuttal that three of Ms. Phillips's chosen sales could not reasonably be considered comparable to the subjects, setting aside the large difference between their sizes and the subjects'. Two of those three were sold together in a bulk sale, indicating their sale prices were not arm's-length. Two had slopes greater than 35 degrees, as opposed to the subjects' level grade. Two were outside the city limits, as opposed to the subjects' location within the city; one of the putative comparable properties was located in the management area of the Columbia River Gorge National Scenic Area and was severely constrained in its potential development. Dr. Johnson testified that one of Ms. Phillips's sales

could be considered an inferior comparable—it was situated in a less desirable location, in town on a busy street—but that its sale price supported the subjects' tax roll real market value.

C. *Defendant's Evidence of Value*

Defendant submitted an appraisal report prepared by Dr. Johnson that identified four comparable land sales, three of which occurred in 2014 and one of which occurred in 2017. (Ex A at 25.) The comparable properties ranged in size from 0.37 acre to 0.46 acre. (*Id.*) They were residentially zoned for two different densities, and they were of level grade. (*Id.*) Dr. Johnson prepared a paired-sale analysis of 36 lots in a subdivision located 1.5 miles from the subjects that sold from 2014 through 2017, showing a time trend of 1.45 percent per month over that period. (Ex G.) After time trending, the comparable sales prices ranged from $17.67 to $23.92 per square foot. (Ex A at 25.)

Dr. Johnson made no adjustments other than time trending. While zoning differences permitted partitioning two of the parcels into smaller lots than the subjects could be partitioned into, she found those zoning differences were counterbalanced by neighborhood considerations. (Ex A at 31.) Although she considered the subjects' mountain view superior to the comparables' views, she made no adjustment for it. (*Id.*) She gave most weight to the 2017 sale ($22.91 time-adjusted price per square foot) and to the geographically closest sale ($19.92 time-adjusted price per square foot). (*Id.*) The 2017 sale concerned a property "located close to the freeway, train noise and low-income housing developments." (*Id.* at 27.) Its zoning allowed greater density than the subjects', and its purchaser later subdivided it into four parcels. (*Id.*) The closest sale concerned a property located 0.13 mile from the subjects on Rocky Road. (*Id.* at 28.) It was zoned the same as the subjects. (*Id.* at 25.) The purchaser built a single-family home and resold it; the subsequent purchaser eventually partitioned it to create a second parcel in 2017. (*Id.* at

28.) A half-street improvement was made at the time of the subsequent partitioning. Dr. Johnson's other two comparables were each partitioned into two lots after sale; their distances from the subjects were 1.05 miles and 0.27 mile, respectively. The 1.05-mile distant comparable was in a denser, higher-traffic neighborhood than the subjects. The 0.27-mile distant comparable was zoned similarly to the subjects. Additional details about the comparables are presented in the analysis below where relevant.

Relying on her two primary comparables, Dr. Johnson concluded to a value for the subjects of $21.50 per square foot, or $384,000 each. (Ex A at 31.)

Plaintiff's witnesses disputed Dr. Johnson's conclusion. In Mr. Moller's view, the same costs that rendered development of the PUD infeasible would hinder development of the two subjects considered individually. From his observation of rainfall on the subjects, he concluded their soil profile would not allow for rapid percolation of stormwater or installation of a septic system. As a result, additional open space would need to be reserved, diminishing the number of buildable lots (each of the subjects is large enough to be divided in two), and a sewer line would need to be brought in along Rocky Road at significant expense.

Given the subjects' soil profile, Ms. Heron testified that stormwater retention requirements would allow only three lots to be partitioned out of the two subjects together. She based her opinion on her experience as a principal broker working with developers. She testified that the subjects were distinguished from Dr. Johnson's comparable sales by their lack of utilities, particularly their lack of sewer or septic service.

With respect to septic service, Dr. Johnson testified that she had confirmed with the county that each of the subjects had received permission for a sand filtration septic system in 2001. With respect to soil and drainage, Dr. Johnson's appraisal report states the following: "A

soil analysis has not been provided for the preparation of this appraisal.  It is assumed that both of the sites have adequate soils to support the highest and best use."  (Ex A at 17.)

## II.  ANALYSIS

The issue in this case is the real market value of each of the two subjects as of the assessment date, which was January 1, 2018.  *See* ORS 308.007; 308.210.[2]

A.      *Recalculation of Maximum Assessed Value under Measure 50*

In her Complaint, Plaintiff commented that she had thought Measure 50—the 1997 ballot measure that added Article XI, section 11 to the Oregon Constitution—protected landowners from rapid increases in tax assessment such as the subjects underwent.

Under Measure 50, a property's assessed value is the lesser of its real market value or its "maximum assessed value."  Or Const, Art XI, § 11(1)(b), (f); *see also* ORS 308.146(2).  A property's maximum assessed value typically rises no more than three percent per year.  *See* Or Const, Art XI, § 11(1)(b); ORS 308.146(1).  However, it may rise more than three percent under certain circumstances, including where "[t]he property becomes disqualified from exemption, partial exemption or special assessment[.]"  *See* Or Const, Art XI, § 11(1)(c)(E); ORS 308.146(3)(e).  When property is removed from special assessment, its maximum assessed value is recalculated as a fraction (known as the changed property ratio) of its real market value.  *See* ORS 308.156(5).

In this case, the subjects were recently removed from special assessment, and the three-percent limit on increases to maximum assessed value does not apply.  *See* ORS 308.146(3)(e).  The ratio of assessed value to real market value on the tax statements indicates the changed property ratio was 58.3 percent.  Even if Defendant had not increased the subjects' tax roll real

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

market values above $155,000, the assessed values would have risen to approximately $90,000, a more than 600-fold increase over their prior level under special assessment. *See* ORS 308.156(5). Because of the increased real market value, the current assessed value is roughly double that amount.

The determination of real market value in the year after removal from special assessment is of particular moment because that value determines the new maximum assessed value, which becomes the baseline for future three-percent increases.

B.      *Valuation*

To bear the burden of proof, a party seeking a change to the tax roll "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). It is not enough merely to criticize the other party's position. *Id*.

Here, the parties agree the subjects' highest and best use was residential development. Although some testimony alluded to the possibility of developing both subjects together, the parties valued them as stand-alone properties. *See First Interstate Bank of Oregon v. Dept. of Rev.*, 306 Or 450, 453, 760 P2d 880 (1988) (holding with respect to fully developed land lots in subdivision that "[t]he value of each lot by itself, not as a portion of a larger piece of property, must be assessed"); *Neupert v. Dept. of Rev.*, 13 OTR 407, 411–12 (1995) (holding homeowners' adjacent undeveloped lot entitled to stand-alone assessment); *but see First Interstate*, 306 Or at 453 n 2 (noting possible exception for lots having highest and best use as part of group of lots), *cited by Powell Street I v. Multnomah County Assessor*, 365 Or 245, 260, 445 P3d 297 (2019). Based on the available evidence, the court follows the parties in valuing the subjects separately.

/ / /

Plaintiff's primary valuation evidence was Ms. Phillips's competitive market analysis. By its terms, that analysis concludes to a recommended list price and "current value" as of November 2018 rather than a real market value as of the assessment date. The sales comparables on which it relies are unverified. They are not adjusted for time or for size, despite being significantly smaller than the subjects, and there are additional significant differences of grade and location. The court is unable to rely on Ms. Phillips's competitive market analysis.

Although Mr. Moller gave knowledgeble testimony about the obstacles to developing the subjects as part of a PUD, it was not clear those obstacles would prevent independent development of the subjects. Mr. Moller opined that the subjects could not be approved for a septic system because of his observations of the soil's behavior during a rainstorm. However, Dr. Johnson credibly testified the subjects had each already received approval for a septic system—testimony buttressed by the presence of a septic system on the neighboring lot containing Plaintiff's home, which presumably had similar soil.

Dr. Johnson's appraisal relied on four verified comparable sales of approximately the subjects' size. Although most of the comparable sales had occurred in 2014, over three years before the assessment date, their time trending was supported by a paired-sales analysis. Two of the sales shared the same zoning as the subjects, and two were zoned for a higher density. The higher density sales commanded a higher adjusted price per square foot. One of them—the most recent sale—was later subdivided into four parcels. The subjects' zoning would allow partitioning into only two parcels each. Dr. Johnson did not adjust for higher density zoning because she considered any extra value attributable to it to be counterbalanced by the lesser desirability of the neighborhoods. However, no paired-sale analysis or other data supported that

/ / /

determination. Absent such data, the court cannot share Dr. Johnson's conclusion that a lot subdividable into four parcels is equivalent to a lot partitionable into only two.

The comparables with the same zoning as the subjects were both quite close; one was a quarter mile away, the other was just over a tenth of a mile north on Rocky Road. The former of those two sales had access to a sewer line and was immediately partitioned into two lots after sale. The Rocky Road comparable was not connected to the sewer when the sale occurred in 2014, but the sewer had been extended past it by the end of 2017 when another lot was partitioned from it. (*See* Ex A at 17, 28.)

On the evidence before the court, the two comparables that share the subjects' zoning appear most similar to the subjects in terms of neighborhood type and development potential. Those comparables differed from the subjects in that they had more ready access to sewer connections. That is relevant because, in light of testimony about the subjects' soil profile, the extent to which the subjects are partitionable without sewer connections is unclear; it is unknown whether the subjects would be approved for additional septic systems. Yet the Rocky Road comparable sale was completed without a sewer connection and was not partitioned for three years afterward. The subjects, too, might be developed with single houses at first and later partitioned if a sewer line were brought in. The trended per-square-foot sales prices of the two most similar comparables—$17.67 and $19.92—are indicators of the subjects' value, suggesting real market values for the 0.41-acre subjects in the range of $315,579 to $355,763.

This court is responsible for determining the correct real market value on the basis of the evidence presented. *See* ORS 305.412. The tax roll value is not itself evidence of value, and there is no presumption that it is correct. *See J. R. Widmer, Inc. v. Dept. of Rev.*, 261 Or 371, 378, 494 P2d 854 (1972).

Here, Defendant provided the only reliable evidence of the subjects' value. Plaintiff's competitive market analysis is not reliable evidence. Defendant's appraiser's conclusion likely overstates the subjects' value, given its reliance on a comparable with greater capacity for development than the subjects'. Defendant's two comparables with zoning similar to the subjects' are the best evidence of the subjects' value. Placing equal weight on each of them, the evidence indicates a real market value for the subjects of $335,671.

### III. CONCLUSION

Pursuant to ORS 305.412, the court determines the subjects' real market value based on the evidence presented. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of each of the subjects was $335,671 for the 2018–19 tax year.

Dated this _____ day of April 2020.

POUL F. LUNDGREN
MAGISTRATE

***If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within 60 days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.***

***This document was signed by Magistrate Poul F. Lundgren and entered on April 29, 2020.***