DECISION
Plaintiff appeals the 2008-09 and 2009-10 real market value of property identified as Account 417374 (subject property). A trial was held in the Oregon Tax Courtroom, Salem, Oregon on March 15, 2011. Richard Carone (Carone), managing member, appeared and testified on Plaintiffs behalf. Richard Newkirk (Newkirk), Commercial/Industrial Appraiser, appeared and testified on behalf of Defendant.
Plaintiffs Exhibits 1 through 6, 7.1 through 7.5, and 7.7 through 7.9 and Defendant's Exhibit A were received without objection.
 I. STATEMENT OF FACTS
The subject property is "a six-story mixed use building that includes three floors of `spa' space, one floor of office space, and the top two floors are tenant in-filled for restaurant/bar use. The improvements were constructed over a period of three years from 2005 to 2008, with final completion occurring in 2008." (Def s Ex A at 6.) As of the assessment dates, January 1, 2008, and January 1, 2009, the fourth floor was vacant. The parties agree that the building is "unique."
The parties dispute the subject property's gross and rentable square footage. (Ptf's Ex 1 at 18; Def's Ex A at 7.[1]) Newkirk included terraces located on the fifth and sixth floor *Page 2 
(measuring 1,197 square feet and 435 square feet, respectively) whereas Carone submitted evidence in support of his opinion that unless an area includes a roof it is not "fully enclosed" and therefore is not part of the gross or rentable square footage. (Ptf's Ex 7 at 3.) Newkirk testified that the "terraces add value to the subject property" and the "estimated real market of $300,000 for the terraces is reasonable." Carone conceded that the terraces might "add value" for a "restaurant rather than an office space," but should be "excluded from rentable space." Carone submitted evidence of the building architect's sixth floor plan stating that the sixth floor gross (3,159 square feet) and rentable (2,597 square feet) square footage was less than Newkirk stated in his general description.[2] (Ptf's Ex 7 at 7.) He testified that Newkirk has "overstated" the rentable space by "9.2 percent."
Carone testified that the parties have similar estimates of the subject property's 2009-10 real market value using the cost approach before Plaintiff's appraiser made an economic obsolescence adjustment estimated at 52 percent of real market value. (Ptf's Ex 1 at 47.) Carone related the obsolescence adjustment to the "super adequacies" built into the subject property. Newkirk challenged Carone's assumption, testifying that the subject property is located in a "river front zone" and Plaintiff's appraiser made "no mention in his report" even though "there are not many zoned river front properties in Corvallis." (Def's Ex A at 15.) Newkirk also challenged the adjustment, stating that the "subject property was substantially progressed in the process to LEED Silver Certification prior to completion of the project, however there is no evidence that the structure has been officially certified." (Id. at 7.) Carone testified that the subject property "will never be certified at any level." In response, Newkirk referenced Tom Gerding's website, stating that the "building features a `green' roof, efficient energy systems, *Page 3 
and re-used materials throughout." (Id. at 93.) He testified that those features add value through "efficient ventilation and heating and energy savings." The parties agree that the subject property's on-site parking "is an issue" and Plaintiff's appraiser included that issue among its "extraordinary assumptions." (Ptf's Ex 1 at 3.) Newkirk testified that, with the exception of the Hewlett Packard departure, the vacancy rate in the area is low and does not support an economic obsolescence adjustment. Newkirk asked Carone why the appraiser stated that he was "asked to provide the hypothetical fee simple value rather than the leased fee value of the property" when there is "inherent income in the property." (Id.) Carone could not answer the question. Newkirk noted the contradiction in the appraisal report, stating one place that the subject property was assessed at market value and another place that it was assessed above market value. (Seeid. at v, 25, 26.) Carone testified that he thought it came from "copy and paste" and was in error.
Using the cost approach and allowing for an economic obsolescence adjustment, Plaintiff's appraiser determined an improvements 2009-10 real market value of $3,590,000 (rounded) and a land 2009-10 real market value of $170,000. (Ptf's Ex 1 at 104.) Newkirk determined the subject property's 2009-10 real market value using the cost approach to be $8,380,000. (Def's Ex A at 32.) He testified that he identified seven land sale transactions to conclude the subject property's land real market value of $64 per square foot. (Id. at 23 — 28.) Newkirk used Marshall Swift construction cost data plus a 1.65 percent LEEDS materials and certification cost in determining the subject property's improvements real market value. (Id. at 29 — 31.) Both parties agree that the cost approach does not result in the best indication of value for the subject property. *Page 4 
Carone testified that, in determining the subject property's real market value using the comparable sales approach, his appraiser relied "on six comparables in the Corvallis and Eugene area." (Ptf's Ex 6 at 2.) Newkirk testified that the "six comparables chosen by Plaintiff are less than desirable." Carone testified that "[a]fter adjustments, the Appraisal indicates a value of $174.90 per square foot, or $3,490,000 total" for tax year 2009-10 (Id.) Carone testified that he purchased the subject property from a "venture capitalist who took title to the property that he financed during construction." He testified the subject property was "listed for sale at $4 Million." Carone testified that in June, 2009, he paid $3,200,000, allocating $600,000 of the purchase price to personal property. (Id. at 2, 3.) He testified that this sale should be included among the comparable sales because it "is an arm's length transaction at the market value." (Id. at 3.) Newkirk challenged Carone's characterization of an arm's length transaction, referencing Plaintiff's Exhibit 4, an Executive Summary provided by the listing agent, Cushman and Wakefield:
 "The build-to-suit property, completed in 2007, now sits empty. The developer-tenant has vacated the building and the majority investor is seeking to liquidate the asset to the highest bidder. It is estimated that approximately $20 million were spent to complete and furnish the building. The property is offered in `AS IS WHERE IS' condition at $4 million including furnishings.
 The Elements Building represents an excellent opportunity for a value add investor to acquire a high end property at an extreme discount to replacement cost and achieve significant upside through re-leasing the property."
(Ptf's Ex 4 at 1 (emphasis omitted).) Carone testified that the listing was prepared in March 2009, and, after negotiating with the seller and losing two other individuals who considered partnering with him to purchase the building, Carone closed the transaction in early June 2009. Newkirk testified that the seller, who had financed the construction of the subject property's improvement, "called [the note] due by the financing party," and recorded a deed transferring the subject property to Plaintiff "on April 3, 2009 for $3,259,000." (Def's Ex A at 18, 19.) *Page 5 
Carone concluded that stating that "[e]ven though we believe that the sales price is an accurate representation of the value, we will ask only that the Appraisal value, $3,490,000 be considered as the Sales Comparison Approach, rather than the Sales Price" for tax year 2009-10 (Id.) In response to questions, Carone testified that he did not know "anything" about the comparable sales selected by the appraiser.
Newkirk testified about the subject property's highest and best use as vacant and as improved. (Def's Ex A at 21, 22.) Newkirk testified that, for the comparable sales approach, he relied on "three [types of] comparables, medical, office and restaurant" properties. (Id. at 32 — 60.) He noted that it is "difficult to find spa properties like the subject property given the number of treatment rooms" and discussed the use of medical properties as comparable to the subject property, noting the similarities including "piped in music," "treatment rooms," "bathrooms" and "locker or storage rooms." Newkirk made a "qualitative adjustment" given the subject property's superior quality compared to other properties. (Id. at 34.) Newkirk briefly discussed each of the medical buildings, office buildings and restaurant properties he identified as comparable. In determining an indicated 2009-10 real market value using the comparable sales approach, Newkirk testified that he adjusted for the subject property's inadequate "parking" for a "[c]oncluded value via the Sales Comparison Approach —$8,100,000 (Rounded)." (Id. at 61 (emphasis in original).)
Moving to the income approach, Carone testified that "the Appraisal somewhat overstates the value of the property" using the income approach. (Ptf's Ex 6 at 4.) Carone's appraiser determined an indicated real market value of $3,640,000 for tax year 2009-10. (Id. at 8.) Carone testified that the subject property's "indicated rents are much lower — in the $1.50 to $1.75 per square foot range" than the "appraisal [that] indicates a stabilized lease rate (at the best and *Page 6 
highest use) from $2.05 to $2.30, depending on the floor * * *." (Id. at 3, 4.) Newkirk questioned Carone about his partial interest in the business operated on the first three floors of the building and the rental rate charged that tenant. Carone testified that his appraiser concluded that the "highest and best use" for the fifth and sixth floors is "office space" rather than a "restaurant." He noted that "[t]he Appraisal also indicates that costs to remodel the 5th and 6th floors into office space would be on the order of $20-$40 per square foot, so something on the order of $200,000 would need to be spent to achieve `best and highest use'." (Id. at 4.) Newkirk asked Carone to confirm, which he did, that, as of 2008, the subject property "was fully rented based on how it was configured/constructed."
Newkirk testified that, for the "Income Approach to Valuation," he concluded that the "subject property's immediate market for medical and typical office rental properties includes the community of Corvallis * * * [and] Salem." (Def's Ex A at 61.) "Three (3) rent comparables were located within the Corvallis downtown area * * * for developing a market rent value for restaurant space within the Corvallis market." (Id.) Newkirk determined annual lease rates of $29 to $34 per square foot. (Id. at 79, 80.) Carone challenged Newkirk's inclusion of a "national chain" among the restaurant comparable properties, stating that the subject property is not a "fast food" or "drive-up" restaurant. Newkirk responded, stating that, given the available sales, he "had no other choice but to use" those types of restaurants. Carone questioned Newkirk, asking if he checked on the "credit worthiness" of the leases; Newkirk responded that there is a presumption that an owner would not continue to lease to a "problem tenant." Newkirk testified that the "rent comparables" were "compiled into a grid adjustment system similar *Page 7 
to the sale comparison grids." (See id. at 70, 75.) Newkirk testified that he "developed" a capitalization rate using sales and listing of "about 7.5% * * * for medical/office space in the subject property. For restaurant properties, * * * 6.75% [was] utilized which is slightly higher than the average of the first four properties." (Id. at 78.) He testified that he concluded that $5 per square foot was an appropriate expense rate, including property taxes and "2.5 percent" was charged for "structural reserves." (Id. at 79.) When asked about the $5 per square foot, Newkirk testified that he had "no knowledge of the subject property's actual expenses" and it was at "the lower end of the expense range." Carone testified that "his own appraiser" used an expense total of "approximately $10 per square foot" that is substantially less than the subject property's actual expense total of "approximately $12 per square foot." Carone testified that "the county's net operating income is approximately $549,000 per year," "Wakefield's net operating income was $427,000," and "the subject property's actual net operating income is approximately $339,000." Newkirk computed indicated real market values for "Medical Office Space (Floors 1 — 3)," "Office Space (Floor 4) and "Restaurant Space (Floors 5 — 6)" and adjusted that sum for "parking," resulting in an "Indicated Value without parking" of $7,180,000 for tax year 2009-10. (Id. at 81.)
In summary, Carone testified that "[g]iven that the Appraiser is a third party professional with outstanding credentials (See Appraisal, — last page for a resume), we will concur with the Appraisal's estimate of $3,510,000 as market value as of January 1, 2009, and ask the court to adjust the RMV to $3,510,000." (Ptf's Ex 6 at 4.) Newkirk testified that, after looking at the three approaches to value, he concluded that the subject property's 2009-10 real market value is $7,690,000. (Def's Ex A at 83.) *Page 8 
Carone testified that "there was no separate appraisal prepared" for the 2008-09 tax appeal," but "we * * * will rely on the data in the January 1, 2009 and January 1, 2010 Appraisals, plus a Market Conditions Adjustment (Variable Growth Rate) suggested by the Appraiser on Page 62, plus some other comparables that are applicable." (Ptf's Ex 6 at 5.) He continued stating "[w]e believe that the methodology for the cost approach is identical for January 1, 2008, 2009, and 2010. Thus we will repeat what is written in the Appraisal for 2009 and 2010." (Id.) Carone testified that, "to be conservative," he used the "higher (2010) [Marshall Swift replacement cost new] estimate" less the "lower (2009) [economic obsolescence adjustment] value" to arrive at an "Indicated Value using the Cost Approach for Jan 1, 2008 * * * [of] $4.137,421." (Id. at 6.) Relying on the Sales Comparison Approach in the appraisal report prepared for Plaintiff, Carone testified that two additional sales should be added but then concluded that "[t]he Appraiser's judgment of $174.90 per square foot for January 1, 2009, seems reasonable to apply to January 1, 2008, since it is based on roughly the same properties, and the additional data point is substantially lower." (Id. at 7.) Carone testified that "another approach to the sales comparison approach" is to consider "the Variable Growth Assumptions," specifically "there was 3% annual growth until August 2007, then zero growth August 2007 to September 2008, [then] a 10% annual decline from September 2008 through January, 2010. * * * Thus the value at January, 2008 would be adjusted upward by 3.3%, to arrive at $3,600,000 * * * which is on the very high end of these ranges and the most conservative choice." (Id.) Carone testified that the income capitalization approach "gives the best indication of value[.]" (Id.) He testified that "the preponderance of evidence indicates that *Page 9 
the January 1, 2008 rents were somewhat lower than January 1, 2009, but to be conservative, we will use the January 1, 2009 stabilized rental rates per the Appraisal." (Id. at 8.) Carone summarized, stating:
 "We believe that the `best and highest use' of the property did not change between 2008 and 2009. We believe that the Capitalization rate should move down by 3.3% to 8.7%. This is per the same `Variable Growth Rate Assumption' argument on Page 62 of the Appraisal used in the Cost Comparison approach. We believe the stabilized income should stay the same as January 1, 2009 at $338,747, and thus a RMV of $3,640,000 is on the high side, but appropriate."
(Id.)
For tax year 2008-09, Carone testified that "the January 1, 2008 value should be $3,640,000 and ask the Court to change the RMV to that figure. Since January 1, 2008 is the initial settling of the RMV, we also ask the Court to adjust the AVR to 53.2233% of the RMV. At a RMV of $3,640,000, the AVR would be $1,937,330." (Id. at 9.) Newkirk did not present any evidence of the subject property's real market value as of January 1, 2008. He asked the court to sustain the tax roll values.
 II. ANALYSIS
The issue before the court is the 2008-09 and 2009-10 real market value of Plaintiff's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citingGangle v. Dept. of Rev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [3] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year." *Page 10 
A. Purchase Price
The sale price of a recent, voluntary, arm's-length sale of property "between a willing buyer and seller, both of whom are knowledgeable," although not "conclusive, is very persuasive of market value[.]" Kem v. Dept. of Rev.,267 Or 111, 114, 514, P2d 1335 (1973). See alsoSabin v. Dept. of Rev., 270 Or 422, 426-27, 528 P2d 69 (1974); and Equity Land Res. v. Dept. of Rev.,268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether the sale was "recent" and whether it was "arm's-length." (Kem, 267 Or at 114.) Plaintiffs purchase of the subject property closed four to six month after the January 1, 2009, assessment date. Plaintiffs purchase was close to the January 1, 2009, assessment date but was definitely not recent for the January 1, 2008, assessment date. At the time of Plaintiff s purchase, the subject property was not a bank-owned property but owned by an individual who had financed the subject property's construction through a loan similar to a bank construction loan. That individual obtained title to the subject property when the developer discontinued making loan payments. That individual listed the property for sale, stating that "the majority investor is seeking to liquidate the asset to the highest bidder." (Ptf s Ex 4.) A property purchased from such a seller may well involve an element of compulsion on the part of the seller. There are many practical reasons why the sale of a property quickly after an investor takes title might involve an atypical market condition, rendering the transaction of little or no value as an indication of market value. For example, the sale, at best, likely represents the low end of the real market value range and may have been well below the actual market value of the property. The seller was quoted as stating that he "was eager to see the empty building come back to life. And, especially given the slow real estate market, he knew he'd never be able to recoup all of his investment in the project." (Ptf s Ex 3 at 6.) In this case, the subject property was sold within a *Page 11 
few short months of listing the property and at a sale price 20 percent less than the listing price. There is a possibility that the seller might have negotiated a "revenue-sharing deal." (Id. at 5.) Plaintiff offered no competent evidence other than its own purchase price to support Carone's belief that the purchase price was the subject property's real market value. That singular, self-serving evidence is unpersuasive.
B. Plaintiff's Burden of Proof
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. of Rev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev, 4 OTR 302 (1971)). Plaintiff submitted an appraisal report that was prepared by someone other than Carone. The individual who prepared the report did not testify. Newkirk pointed out several issues with the appraisal report submitted by Plaintiff. With no testimony from the appraiser who prepared the appraisal report submitted by Plaintiff and no opportunity for Newkirk's challenges to be answered, the court does not find that Plaintiff's evidence was more convincing than Defendant's appraisal report, especially given Newkirk's testimony about the appraisal report he prepared. Carone was Plaintiff's only witness. Carone, who did not qualify himself as an expert, relied on his personal opinions and "variable growth averages" to support a reduction in the subject property's 2008-09 real market value. The court finds that testimony inconclusive.
Even though Plaintiff failed to carry its burden of proof and the "burden of going forward with the evidence" has not shifted, the court has jurisdiction to determine the "real market value *Page 12 
or correct valuation on the basis of the evidence pleaded by the parties". ORS 305.427 and ORS 305.412. For Defendant, Newkirk presented an appraisal report, including all three approaches of valuation for tax year 2009-10. Defendant presented no evidence for tax year 2008-09.
For tax year 2009-10, the court agrees with the parties that the cost approach should be given little, if any, weight in determining the subject property's real market value. The court concludes that, because the subject property is an income producing property that was fully occupied at the time of assessment, the income approach should be given the most consideration. The court agrees with Plaintiff that Defendant overstated the amount of rentable square footage and selected an expense ratio at the low end of the range. The court agrees with Defendant that the terraces, even though not rentable square footage, are an attractive amenity and add value to the subject property. After reviewing all the testimony and evidence, the court concludes that the subject property's 2009-10 real market value is $5,500,000. According to the evidence submitted, the subject property's 2009-10 maximum assessed value and assessed value is $5,209,215. For the court to order a change in real market value to the tax roll, Plaintiff must be aggrieved. ORS 305.275(1)(a). To be aggrieved, the ordered change to the tax roll must result in a property tax reduction. The court was not presented with evidence to determine whether a property tax reduction would result from the court's determination of the 2009-10 real market value.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. The court concludes that the subject property's 2009-10 real market value is $5,500,000. Now, therefore, *Page 13 
IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of property identified as Account 417374 is $5,500,000 and the tax roll will be adjusted only if Plaintiff is aggrieved; and
IT IS FUTHER DECIDED that there shall be no change to the 2008-09 real market value of property identified as Account 417374.
Dated this ____ day of May 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on May 10, 2011. The Court filed and entered this documenton May 10, 2011.
[1] The court will use the numbering system set out in Plaintiff's Exhibit 1. The "Executive Summary" and "Subject Photographs" are numbered i through xv.
[2] Newkirk reported 3,692 gross square feet and 3,093 rentable square feet for the sixth floor, excluding the terrace. (Def's Ex A at 7.)
[3] References to the Oregon Revised Statutes (ORS) are to year 2007. *Page 1