Argued September 11, reversed and remanded November 15, 1974

## SABIN ET AL, *Appellants, v.* DEPARTMENT OF REVENUE, *Respondent.*

528 P2d 69

*Charles E. McGinnis* of Phillips, Coughlin, Buell, Stoloff & Black, Portland, argued the cause and filed briefs for appellants.

*Alfred B. Thomas,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General and Theodore W. de Looze, Chief Tax Counsel, Salem.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL and SLOPER, Justices.

O'CONNELL, C. J.

Plaintiffs appeal from a decree[1] of the Oregon Tax Court sustaining an order of the Oregon Department of Revenue[2] establishing the assessed value of plaintiffs' real property as of January 1, 1971.

The subject property is an 85,392 square foot site between S.E. Stark and Washington Streets and 103rd and 105th Avenues in Multnomah County. The property is improved by a restaurant building and associated parking lot. The geographic area has changed rapidly from a low density suburban commercial area to the site of two shopping centers and numerous satellite businesses. As a consequence the value of plaintiffs' land has risen dramatically. This appeal presents several questions of the principles to

[1] The Tax Court issued a letter opinion and an opinion on rehearing in this case. Sabin v. Department of Revenue, TC No. 721. Neither have been selected for publication in Oregon Tax Reports. 5 OTR Adv Sh No. 7, p. 2 (Oct. 1973).

[2] Order No. VL 72-621.

be used in determining "true cash value" in these circumstances.

The assessment affirmed below embodied the determination, not disputed by plaintiffs, that the highest and best use of the subject property was as raw land suitable for development of service business as satellites to the adjacent shopping centers. The assessor determined that such development would require a division of the property into smaller parcels suitable for the envisioned uses. He hypothesized a division into three parcels; two of 19,000 square feet each containing the best street frontage at either end of plaintiffs' holding, and a residual parcel of approximately 40,000 square feet in the center. He then analyzed sales of comparable properties of these hypothetical sizes and determined that the more desirable end parcel should bring $7.00 per square foot, the opposite end parcel $6.50 per square foot, and the intermediate parcel $6.00 per square foot. Addition of these values yields the total assessed value for the land of $541,000.

■ To the land value thus obtained, the assessor added $24,800 as the true cash value of the improvements. Plaintiffs attack the assessment on various grounds. The principal contention is that the subject property should have been assessed as one piece and therefore it was erroneous to value the property on the basis of a hypothetical division of the property into smaller units. We find no error in making the assessment on the basis of a division of the property into several parcels. There is no reason why a large parcel should not be hypothetically subdivided for the purpose of assessment when the evidence indicates, as it does here, that such division is required to

effectuate the highest and best use of the property. Only in such a way can one realistically determine the "true cash value,"[3] upon which an assessment must be based.[4]

Plaintiffs also contend that the Tax Court erred in failing to consider two transactions involving portions of the subject property. The first was the purchase by plaintiffs of 19,300 square feet of the subject property for approximately $3.70 per square foot in 1969. The second transaction was a sale of approximately one half of the subject property in November, 1972, almost two years after the assessment date, at $5.00 per square foot.[5] The 1969 purchase was rejected by the assessor and the Tax Court as so remote in time, considering the rapidly escalating land prices in the area, that it was not relevant to the value as of the assessment date. The 1972 sale was rejected by the Tax Court as impermissible hindsight.[6]

■ The principles governing the use of dealings in the assessed property itself to show its value are well established. A sale of the property within a reasonable time of the assessment while not conclusive, is very persuasive of market value.[7] Whether a transaction

---

[3] ORS 308.205.

[4] The calculation is not different in kind from the corner enhancement calculation standard among professional appraisers. See, e.g., S. Kahn, F. Case and A. Schimmel, Real Estate Appraisal and Investment, pp 5, 288-289, 443 (1963); A. Ring, Valuation of Real Estate, p. 305 (1963).

[5] The 1972 sale included the 19,000 square foot parcel found the most desirable and valued at $7.00 per square foot by the assessor.

[6] The evidence of the sale came in as an offer of proof "under the rule."

[7] Kem v. Dept. of Revenue, 267 Or 111, 114, 514 P2d 1335 (1973).

is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment.[8] The interval between the transaction in the subject property sought to be introduced and the assessment date may be so great that it can be said as a matter of law that there was a change in conditions.[9] However, where this determination cannot be made as a matter of law, reference must be made to the underlying conditions affecting value before such evidence can be rejected. These principles apply equally to transactions in the assessed property before and after valuation date.[10]

■ In this light, the determination of the Tax Court as to the 1969 purchase is clearly correct. The evidence was conclusive that prices in the area of the subject property rose dramatically between 1969 and the assessment date because of a fundamental change in the use of the land in the area. This rapid change in a basic condition affecting value rendered the 1969 purchase sufficiently remote to warrant its rejection.

■ The situation is materially different with respect to the 1972 sale.[11] There is no indication in the record

---

[8] Fidelity Sec. Corp. v. Brugman, 137 Or 38, 48, 1 P2d 131, 75 ALR 1333 (1937).

[9] See, e.g., Oregon R. & N. Co. v. Eastlack, 54 Or 196, 205, 102 P 1011 (1909).

[10] State v. Kapahi, 48 Haw 101, 112-13, 395 P2d 932, 939 (1964).

[11] The Tax Court rejected evidence of this sale apparently on the assumption that evidence of events subsequent to the assessment date is irrelevant. The position taken by the Tax Court is exemplified by the following passage from its opinion on rehearing:

that the conditions affecting market value in 1972 were substantially different from those in 1971. The shift in land use appears to have been largely completed by 1971, and there is no reason shown to suspect a depression in land prices. We must, therefore, reverse and remand for reconsideration of the assessment in light of the excluded 1972 sale. Needless to say, it will be open to defendant to attempt to show any shift in underlying conditions which might render the 1972

"* * * It appeared to the court that a preponderance of the evidence sustained the conclusions of defendant's witness when the problem was given consideration as of the assessment date January 1, 1971. The court, while recognizing the knowledgeability of the plaintiffs' witness with regard to the property, concluded that his testimony was substantially affected by matters which took place after the assessment date, his overall view being colored by hindsight. It is difficult, of course, to preclude such impressions when the case is tried two and one-half years after the assessment date, but every effort must be made to achieve the perspective of knowledgeable buyers and sellers immediately before and on that date."

Where facts relating to the value of the assessed property are not known at the time of the assessment, and if known at that time would have affected the market value of the property (as, for example, where it is later discovered that the property contains valuable minerals), hindsight acquired by a later discovery of such facts should not be employed to change the valuation found on the assessment date. But this is to be distinguished from the situation such as in the present case where there is no showing that the condition of the property at the time of assessment was any different than it was at the time of the subsequent sale. The taxpayer should not be precluded from showing what the market value really was on the assessment date by showing what it was subsequently, and that no change took place between the assessment date and the sale affecting the value of the property. In the present case the assessor based his valuation of the property upon the assumption that the development of neighboring property had produced a trend of rising prices for the smaller parcels similar to the parcel sold in 1972. The 1972 sale proved that this projection was incorrect. Plaintiffs should not be precluded from proving that the assessor had made this miscalculation.

sale price a distorted indication of the value on January 1, 1971.

The plaintiffs further assert that the Tax Court erred in assigning any value at all to the improvements. Plaintiffs' argument is that the improvements are of value only to the present owners in their present restaurant use and that it is inconsistent to assess the land assuming one use and to assess the improvements assuming a contrary use.[22] Defendant replies that the expected holding period of the land before sale can be effected is six to twenty-four months, during which the restaurant is a potential source of income to offset holding expenses such as taxes. In support for its position defendant cites *Nepom v. Dept. of Rev.*, 264 Or 195, 504 P2d 1039 (1972).

*Nepom* does not support the valuation of improvements in this case. In *Nepom,* the property consisted of a parcel of land improved by an apartment house which produced rental income. The land's highest and best use was for light manufacturing and it was valued on that basis. Although the apartment house use was inconsistent with the highest and best use, the Department of Revenue proved that a buyer would pay a premium for the land equal to the capitalized value of the additional stream of income which the apartments would produce during the transition to highest and best use.[23]

In the present case, defendant's expert witness did not evaluate the improvements on the basis of

---

[22] *See* Portland Golf Club v. State Tax Comm., 255 Or 284, 465 P2d 883 (1970).

[23] Nepom v. Dept of Revenue, 264 Or 195 at 199, 504 P2d at 1040. *See,* Bazar, Inc. v. Dept. of Revenue, 266 Or 177, 186, n. 2, 511 P2d 1226, 1230, n. 2 (1973).

capitalizing the income.[13] The assessor expressed the opinion that the improvements would have some value to plaintiffs until the property was sold. But there was no evidence that the presence of the improvements on the property would prompt a purchaser to pay a premium over the value of the land without improvements. The figure of $24,800 represents the replacement cost of the improvements, assuming a two-year life on the assumption that this measured the value to plaintiffs during the expected holding period. This is exactly the sort of inconsistent position disallowed in *Portland Golf Club v. State Tax Comm.*, 255 Or 284, 465 P2d 883 (1970). The value to plaintiffs is irrelevant to the question of the market value which is to be determined by reference to the factors which govern the amount a willing buyer would pay on the assessment date.[15] It being admitted that the improvements

[14] "Q: Well, the $24,800 represents the value of the income stream until the building is torn down. Is that what you're saying?

"A: No, I'm not saying that. I'm saying what it represents is—is that the value of the building on a cost basis on—with a remaining life of approximately two years. In other words, if you estimated the reproduction cost new of the building and gave it a remaining life of two years, based upon its life, for all the blacktop and all the yard improvements, the buildings and everything in the real property, that this remaining value would be $24,800."

[15] The position taken by defendant in this case indicates another misconception which would promote future confusion. The assessor's assumed life of the property was arrived at by reference to the expected reasonable time for sale of the land. This concept is apparently derived from O.A.R. 150-308.205-(A) 1.a.:

"Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, *allowing a period of time typical for the particular type of property involved* and under conditions where both parties to the transaction are under no undue compulsion to sell or

would have no effect on that amount, their assessment can not stand.

Reversed and remanded.

---

buy and are able, willing and reasonably well-informed." (Emphasis added.)

The assessor apparently took this to mean he could value the property on the basis of a sale two years from the assessment date. This is incorrect. The property must be valued at its "true cash price" on the assessment date. ORS 308.205. The only meaning of the italicized language in the regulation above is that the value is not to be depreciated by assuming the seller will take the highest price obtainable in one day, or appreciated by assuming he will hold out indefinitely for the highest conceivable price, but instead will act like the normal seller. The regulation is not meant to require or allow the assessor to speculate in detail on how the sale will be conducted and govern his assessment accordingly. In cases of transition in use, as much as in any other, the assessor's task is to determine the price which a willing, knowedgeable seller would accept as of the assessment date in a sale conducted in the usual manner, that is, without unusual haste or compulsion on one hand, or without unusual delay on the other.