CARL N. BYERS, Judge pro tempore.
 

 Plaintiff appeals from an Opinion and Order of the
 
 *[11]
 
 Department of Revenue, No. VL 78-212, dated May 17, 1978, upholding the assessed values on certain of its land, building, improvements, machinery and equipment as of January 1, 1977. The assessed values and the values contended for by plaintiff are as follows:
 

 Assessed Value Plaintiff’s' Value
 

 Land $ 43,675 $ 7,676
 

 Improvements 293,100 243,031
 

 Machinery and equipment 389,280 51,652
 

 Total $726,055 $302,359
 

 The subject property is a cookie-manufacturing plant located in McMinnville, Oregon. Employing 35 people, the plant produces approximately 150,000 to 170,000 packages per week. The cookies are marketed under the franchise "Archway Cookies,” in a marketing area consisting of the states of Oregon, Washington, Idaho and Alaska.
 

 The plant is situated on 2.25 acres of land, adjacent to Highway 99W, improved with a main plant building, smaller storage buildings, and a parking area. The main building, constructed in 1954, is L-shaped and contains 29,350 square feet. The machinery and equipment comprise two lines of cookie production. In the sequence of production, there are bulk storage hoppers, mixers, formers and droppers, ovens, cutters, cooling conveyors, dusters or coating equipment, wrappers and packaging machinery. In addition, there is various support equipment, such as tubs, bowls, carts, and refrigeration equipment.
 

 Plaintiff’s position is as follows: All the stock of the Smith Cookie Company, which is an Oregon corporation, was sold by its founder, Cloyce Smith, to Mr. Roy Wahl and Mr. L. Frank Setniker and their wives in March of 1976 for $1,175,000.
 
 *
 
 At the time of the sale
 
 *[12]
 
 of the stock of the corporation, the corporation had various other assets in addition to the subject property, the main ones being: accounts receivable and cash; a warehouse (land and building) located in the State of Washington; vehicles; office equipment, and miscellaneous other assets. Plaintiff contends that the sale price of the stock set the "upper limit of value” for all of the corporate assets. Using a "residual value” approach, plaintiff would deduct from the stock purchase price the book value of all assets other than the subject property. Plaintiff contends that the portion of the purchase price which remains is necessarily the market value of the subject property.
 

 It should be noted that, although the purchase price for the stock is in excess of the total book value of the company, the value which plaintiff assigns to the subject property is the depreciated book value of those assets. Also, because the purchase of the stock took place in March 1976, the plaintiff’s value for the subject property as of the assessment date of January 1, 1977, is $58,357 less than the book value of the same property as of the date of the purchase. Finally, plaintiff allocates the sum of $196,409 of the purchase price to goodwill, franchise and trade name.
 

 The evidence adduced by the parties is reflective of their respective positions. Plaintiff produced three witnesses, the first of which was Mr. Roy Wahl, one of the principals involved. Mr. Wahl was not qualified to testify nor did he have an opinion as to the value of any of the subject property except the machinery and equipment. He did testify as to the conditions and circumstances surrounding the sale of the stock and established to the satisfaction of the court that the sale was an arm’s-length transaction. Mr. Wahl also testified that there was a used market for cookie machin
 
 *[13]
 
 ery and equipment. Mr. Wahl’s testimony tended to be weak in two respects. First, he indicated that he had not appraised each piece of the subject equipment individually but had concluded that the book value was representative of the equipment’s market value. This conclusion is inconsistent with the evidence that some of the equipment was depreciated to zero book value and yet would have some salvage value. Second, Mr. Wahl’s interest in appraising equipment was limited to seeking replacements or upgrading equipment for Smith Cookie Company, which greatly limited the number of transactions with which he was concerned.
 

 Mr. Wahl’s testimony was valuable in establishing that there is or can be a wide differential in the market value of new equipment as opposed to used equipment. He testified specifically as to several items, one of which was a tumbler or wrapping machine, which has a cost new three to four times that of the cost used, including freight and reconditioning. Mr. Wahl also testified that, in his opinion, a cookie production line comparable to the subject lines could be purchased used, in place, for $60,000, plus an additional $30,000 for freight and assembly. He emphasized, however, that such a line would be considerably newer than the subject lines which he expects to have to replace in three to five years. As to the subject lines, he believes that comparable lines could be purchased on the used equipment market for $20,000 per line.
 

 Plaintiff’s next witness was Mr. G. Dale Belford, a certified public accountant specializing in appraising closely held corporations. Mr. Belford’s approach to valuing the subject property was to first value the corporate entity as a going concern. He did this by examining the financial statements of the company and comparing them with statements of publicly held companies. He then determined that an appropriate profits and earnings ratio was 8 to 1, based upon comparison with other companies such as Nabisco; Pet, Inc.; and other diversified companies. The value
 
 *[14]
 
 found by applying this profits and earnings ratio to the Smith Cookie Company net income was then discounted for the reason that the Smith Cookie Company is a "closely held” corporation. His ultimate conclusion was that the fair market value of the company was less than its net book value.
 

 Mr. Belford reasoned that to the extent the purchase price paid was in excess of the net book value, such excess had to represent intangible factors such as goodwill. Mr. Belford emphasized that the sale price of the stock in this case exceeded that which a third party would pay based upon the income earned by the company. He believes this demonstrates that the book value of the property must be equal to its true cash value and any difference between book value and the sales price had to represent goodwill and other intangibles.
 

 Mr. Belford’s use of multinational, highly diversified companies in determining the profits and earnings ratio, discounting the value of the
 
 company
 
 because it is a "closely held” corporation, and concluding that the fair market value was less than the net book value, as well as other assumptions and conclusions, causes the court to give his testimony little weight.
 

 Mr. L. Frank Setniker, the other principal involved, is a farmer and businessman. He testified that he investigated the sale as a going business, concerned primarily with its "ability to pay its way.” After testifying as to the circumstances of the sale, indicating that it was an arm’s-length transaction, Mr. Setniker testified that the ultimate price paid was based upon the income earned by the company (which evidence alone rebuts the testimony of Mr. Belford). Mr. Setniker indicated that no appraisals were made in connection with the purchase of the company since he looked at the business as a whole.
 

 
 *[15]
 
 Defendant produced two witnesses in its behalf. Mr. Eugene McKinley testified as to the value of the land only. Mr. McKinley found that the land was zoned as commercial-industrial, which was also its highest and best use. Mr. McKinley’s opinion, which supports the assessed value, was based upon three comparable sales—one of which was an adjacent parcel purchased by Smith Cookie Company. Plaintiff’s motion to strike Mr. McKinley’s testimony because he valued the land on the assumption that it was "bare” was denied. It is clear from the context and tenor of his testimony that Mr. McKinley was merely indicating that he was valuing the land only, exclusive of all improvements. He also indicated that the present use of the property was consistent with the appraised use, and if such uses were not consistent, any reduction would be made in the value of the improvements and not the land.
 

 Defendant’s second witness was Mr. Roy Trask, an employee of the Department of Revenue, a licensed architect and certified appraiser for many years. Mr. Trask appraised both the improvements and the machinery and equipment. Although considering all three approaches to value, Mr. Trask relied primarily upon the "reproduction cost new less depreciation” approach. Using this approach, he determined that the buildings and structures would have a true cash value of $420,000 and the machinery and equipment, a true cash value of $710,000, for a total of $1,130,000.
 

 Mr. Trask explained that he used the cost approach primarily because of the unreliability of the income approach and the absence of any market data for use of the market approach. He concluded that, based upon his investigation, there was no established market for used cookie-making equipment which could be relied upon. His investigation consisted of discussions with several dealers, visits with other cookie manufacturers, and inquiries of cookie equipment manufacturers. From the information gathered, he concluded that used equipment would sell for 50 to 60 percent of its cost new. Using this basic guideline, Mr. Trask valued
 
 *[16]
 
 each of the items of equipment in the Smith Cookie Company plant.
 

 Considering the real property first, the court finds that the preponderance of the evidence supports the assessed value of the land and the improvements. The only evidence submitted by the plaintiff as to the value of the Iqnd was its book value. Since most of it was purchased in 1954, it is unreasonable to believe that the value of such land has not increased in the last 24 years. Likewise, with regard to the value of the improvements, plaintiff’s depreciated book value can have only the slightest, if any, relationship to its true cash value. All of the evidence indicated that the improvements were appropriate to the land, consistent with its highest and best use, and were well maintained. Under such circumstances, common knowledge of inflation and the cost of construction would raise serious question as to the validity of book value as true cash value even if there were no other evidence.
 

 The evidence with regard to the value of the machinery and equipment is less clear. Although Mr. Trask made an extensive investigation and appraised the subject equipment on an item-by-item basis, the court is not persuaded that the cost approach must be used. Mr. Wahl’s unequivocal testimony was that there is a used equipment market and that several of the items in question had been purchased used. In rebuttal to Mr. Trask’s testimony that there were no published brochures for used equipment, plaintiff introduced a brochure announcing the sale of equipment from a baking company. However, plaintiff did not submit catalogues or price lists for such used equipment as might be expected in an established market. Also, Mr. Wahl’s own testimony, with regard to the cost of purchasing just one line of used equipment, indicates a value far in excess of that contended for by the plaintiff. From plaintiff’s evidence, it appears to the court that, as a general rule, used bakery equipment as here would cost approximately one-third of its
 
 *[17]
 
 cost new, including freight, reconditioning, and installation. This general guideline would produce a total value for the machinery and equipment in question of approximately $385,000. The assessed value in question is $389,280. In this light, the court finds that the preponderance of the evidence supports the assessed value of $389,280.
 

 Plaintiff contends that the sale of the corporate stock sets the upper limit for all of the corporate assets under the rule set forth in
 
 Sabin v. Dept. of Rev.,
 
 270 Or 422, 528 P2d 69 (1974);
 
 Equity Land Res. v. Dept. of Rev.,
 
 268 Or 410, 521 P2d 324 (1974); and
 
 Kem v. Dept. of Rev.,
 
 267 Or 111, 514 P2d 1335 (1973). All of these cases are distinguishable in that in each of those cases the sale in question was of the specific property whose value was being sought. Here, the sale was not of the property in question but of corporate stock. Stock represents ownership not just of the assets in question, but the ownership of a going concern. Consequently, its value is subject to liabilities, market conditions, and all of the other factors which contribute to or detract from the value of a company. In addition, the stock was purchased under an installment sale agreement which affords the seller significant controls with regard to management decisions and the operation of the company—a factor which may well influence the sale price of the stock but which can or should have no relevance to the value of the property in question. Perhaps most debilitating to plaintiff’s argument is its own evidence that none of the parties to the stock sale separately valued the assets of the corporation. A stock sales price based upon earnings of the company or even upon book value cannot logically be applied to establish the market value of a single asset within the corporation. As the proverbial farmer giving directions is supposed to have said, "You can’t get there from here.”
 

 The defendant’s Order No. VL 78-212, dated May 17, 1978, is sustained. The true cash value of the
 
 *[18]
 
 subject property on January 1, 1977, is found to have been $726,055.
 

 Costs to neither party.
 

 *
 

 There is some conflict in the evidence as to the exact sales price. The sale agreement (PI Ex 1) recites a price of $1,125,000, but plaintiff’s other exhibits and representations have indicated a price of $1,175,000. In
 
 *[12]
 
 connection with the sale, the two purchasers agreed to pay Mr. Smith an additional $75,000 for a covenant not to compete. However, there was no evidence presented as to whether the cost of the covenant not to compete was considered as part of the total purchase price.