DECISION
Plaintiff has appealed the tax year 2010-11 real market value (RMV) of certain real property identified in the assessor's records as Account R575139. The appeal is timely from an order of the county board of property tax appeals (Board).
Trial in the matter was held by telephone November 3, 2011. Plaintiff appeared and testified on his own behalf. Defendant was represented by Dave Babcock (Babcock) and Tina Burell (Burell), both of whom are appraisers with the Multnomah County Assessor's office. Burrell, an Oregon registered appraiser, prepared Defendant's appraisal report and testified for Defendant. Mike Watson, also an appraiser with the assessor's office, testified briefly about his involvement in the verification of the sale of the subject.
 I. STATEMENT OF FACTS
The subject property is a 0.10 (one-tenth) acre unimproved, buildable flag lot purchased by Plaintiff on or about November 15, 2010, for $20,000. The property previously sold on or about June 26, 2006, for $80,000. (Def's Ex A at 3.)
The RMV on the assessment and tax rolls as of January 1, 2010, which is the assessment date for the 2010-11 tax year, is $106,000. The maximum assessed value (MAV) and assessed value (AV) on the rolls are $58,960. Plaintiff appealed the values of the property to the Board *Page 2 
and the Board sustained the values. Plaintiff timely appealed to this court. By his Complaint, Plaintiff has requested an RMV of $20,000 based on the $20,000 purchase price in November 2010.
Plaintiff purchased the property under contract with the seller PK Real Estate, LLC. (Defs Ex A atl4.) The date of the contract is October 29, 2010. (Id.) A statutory warranty deed was subsequently recorded November 15, 2010. (Id. at 12-13.) The signature for the seller on the Warranty Deed is Donald F. Kirby (Kirby), Managing Member, PK Real Estate, LLC. (Id. at 13.) The contract, submitted into evidence by Defendant, shows that the seller provided Plaintiff with financing, and that Plaintiff was not required to make any down payment. (Id. at 15.) Under the terms of the contract, Plaintiff was to begin making monthly payments of $100 for a period of 24 months, with an annual interest rate of six percent on the unpaid balance, after which time the remaining unpaid balance was due in full. (Id.) The contract calls for payments to begin on January 1, 2011, roughly two months after the execution of that document.
Plaintiff testified that he worked for Kirby prior to purchasing the subject property. According to the testimony, Plaintiff responded to an advertisement placed by Kirby on Craigslist, and spent "several dozen hours" working for Kirby doing some "web design work."
There is a dispute between the parties as to whether Plaintiff paid any additional consideration for the purchase of the subject property, Plaintiff insisting he did not and Defendant, through the testimony of Watson, contending Plaintiff told him during the sales verification process that he paid an admittedly low price for the property but had done some graphic design work for the seller and that they were friends and business associates. According to Burell, notes in the assessor's records made by Watson after speaking with Plaintiff about the purchase (as part the assessor's sales verification process) indicate that Plaintiff told Watson that *Page 3 
the sales price included "professional marketing work Plaintiff did for Kirby." Plaintiff denies making that statement and testified that Kirby paid him by check for the web design work done at a rate of $15 per hour. Plaintiff reiterated that the $20,000 reflected in the sales record includes the entire purchase price and that no additional consideration was given for the property.
Defendant submitted a collection of documents including a summary valuation report for the subject property (Def s Ex A.) The appraisal report was made by Burell, who testified that she obtained the assistance of Babcock in valuing the property. That report presents five comparable sales, all of which are unimproved buildable lots within one mile of the subject property and very similar in size to the subject. (Id. at 5-6.) Two of those sales occurred in August 2009, two in September 2009, and one on January 8, 2010. (Id.) The assessment date is January 1, 2010. Defendant's unadjusted sale prices range from a low of $70,000 (comp #5) to a high of $147,000 (comp #4). Burell made several adjustments to her sales and concluded that the market value for the subject property, as of January 1, 2010, was $103,200. (Id. at 5.)
 II. ANALYSIS
The issue in this case is the RMV of Plaintiff s unimproved lot as of January 1, 2010. Oregon law defines RMV for property assessment and taxation purposes as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[1]
While there are three recognized methods for valuing property, the sales comparison approach is most appropriate for valuing residential property, particularly in cases where only the *Page 4 
value of the land is at issue.[2] The court looks at arm's-length sales transactions of similar property to determine a correct RMV.Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003). The sale of the subject property can also provide a useful indication of the value of the property.Kem v. Dept. of Rev.,267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted) (ruling that a recent sale of the property in question can be persuasive although not conclusive of a property's value).
The Oregon Supreme Court in the Kem case ruled that "[a] recent sale of the [subject] property * * * is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." Id. (citations omitted). However, the Court in Kem "emphasize[d] that a recent sale of the subject property is not necessarily determinative of market value and does not foreclose other methods of valuation[.]" Id. at 115;see also Sabin v. Dept. of Rev.,270 Or 422, 426-27, 528 P2d 69 (1974); Equity Land Res. v. Dept. ofRev., 268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether the sale was "recent" and whether it was "arm's-length." Kem, 267 Or at 114.
The value of property is ultimately a question of fact. ChartDevelopment Corp. v. Dept. of Rev.,16 OTR 9, 11 (2001) (citation omitted). By statute, Plaintiff has the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. This court has previously ruled that "[p]reponderance of the evidence means the *Page 5 
greater weight of evidence, the more convincing evidence."Feves v. Depart. of Revenue, 4 OTR 302, 312 (1971); see alsoRiley Hill General Contractor v. Tandy Corp.,303 Or 390, 394, 737 P2d 595 (1987) (where the Oregon Supreme Court explained that the derivation of the word "preponderance" is Latin in origin and "translates to `outweigh, be of greater weight.'").
Burden of proof requires that the party seeking relief (Plaintiff in this case) provide evidence to support their argument. The evidence that the plaintiff provides must be competent evidence of the requested RMV of the property in order to sustain the burden of proof.Woods v. Dept. of Rev., 16 OTR 56, 59 (2002). While there is no presumption that a tax assessment is valid, a taxpayer may not simply rest on his or her personal views. See id. If a taxpayer merely criticizes the county's position, the taxpayer will fail to sustain the burden of proving that the RMV of his or her property is something other than the value on the tax roll. Freitag v. Dept. of Rev.,19 OTR 37, 44 (2006). Further, evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof.Reed v. Dept. of Rev., 310 Or 260, 265, 798 P2d 235 (1990).
Plaintiffs case hinges largely, if not entirely, on the $20,000 purchase price. Defendant insists that the purchase price is not reflective of market value because it was not an arm's-length transaction. That conclusion is based on the fact that the buyer and seller knew each other. The extent of that relationship is somewhat unclear. Plaintiff did some work for the seller. There is nothing in evidence to show that Plaintiff and the seller were personal friends who knew each other before Plaintiff responded to an advertisement on the Internet by an individual (Kirby) looking for someone to do some updating to his website.
When questioned by the court, Plaintiff testified that he had taken real estate courses and had read some books about real estate. Plaintiff further testified that he had recently bought *Page 6 
another property in Washington County. Plaintiff also testified that he was aware that the seller had previously rejected an offer of $25,000 for the property in March 2010, roughly seven months prior to Plaintiff presenting his offer. Furthermore, Plaintiff testified that while he was at the seller's office he heard Kirby talking with someone about the property and complaining about it. Plaintiff testified that he went home and thought about Kirby's lot in light of what he knew of the property's history and Kirby's growing desire to sell. Plaintiff testified that he went back to Kirby's office and told him he was interested in the property and would give him $20,000. According to his testimony, Kirby told Plaintiff that he would have to think about it because he felt that the offer was somewhat low. Plaintiff later went back and spoke with Kirby and the parties eventually agreed to a sale price of $20,000.
In arguing for the rejection of the sales price as being non-arm's-length, Defendant makes a fair point that the subject property was not listed on the open market and Plaintiff received favorable sales terms under the land sale contract. However, as Defendant noted in the appraisal report, Kirby, the seller, owns, or is at least the registered agent for, four separate businesses, all of which are real estate ventures. (Def s Ex A at 3.) Plaintiff testified to his recent education and experience in real estate. Thus, it appears as both the buyer and seller were fairly knowledgeable about real estate matters and property values. And, given the overall poor condition of the real estate market, coupled with the fact that lenders are more reluctant to loan money for the purchase of undeveloped land, the court is not as troubled as Defendant is with the seller's favorable lending terms.
That leaves the question of whether Plaintiff paid additional consideration not reflected in the official documents related to the sale of the property. While Burell testified that notes in the assessor's records, notes not submitted into evidence, reflect that the Plaintiff told Watson *Page 7 
(Defendant's employee) over the phone during the sales verification process that the sales price included professional marketing work Plaintiff had done for Kirby (the seller), when Watson was called to testify specifically on that issue, and particularly about the notes in the assessor's records, Watson did not confirm that information. Rather, Watson simply testified that Plaintiff told him that he got a good deal on the property, that he had done some graphic design work for the seller prior to the purchase, and that he and Kirby were business associates and "friends."
On redirect, Plaintiff explained that he was a "friendly guy," and that the telephone call Watson made to Plaintiff to "confirm" the sale was a very brief conversation that took place when Plaintiff was crossing the street in the rain, and in a hurry to catch a bus. Plaintiff was presumably speaking on his cell phone at the time. It appears as though Defendant made some assumptions about the nature of the sale based on Plaintiff's responses to a few questions about his purchase of the property, and that Defendant's appraisers may have been predisposed to rejecting the sale as non-arm's-length because the price appeared to them to be unreasonably low.
ORS 305.412 provides that: "[w]hen the determination of real market value or the correct valuation of any property subject to special assessment is an issue before the tax court, the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties."
Burell testified that her "best comparables" were her sale numbers one and five. Those properties sold for $80,000 on August 12, 2009 (comp #1) and $70,000 on January 8, 2010 (comp #5). (Def's Ex A at 5, 6.) The court accepts Burell's testimony as to which of her comparable sales are most similar to the subject property. Nonetheless, the court has some concerns with the appraisal report. The most obvious concern is that comparable sale #1 was *Page 8 
adjusted $3,000 because it was 0.08 acres compared to the subject's 0.1 acre, and comparable sale #5 was also adjusted $3,000 because of its smaller size, although that property was only 0.06 acres, or roughly half the size of the subject. It seems unusual that Defendant would apply the same adjustment to both sales. More importantly, that is the only adjustment Burell made to either of those sales, yet, in arriving at her adjusted sale prices, she increased the indicated value of both properties by $6,000, apparently due to a simple mathematical error.[3] (Id.)
Additionally, it is generally understood that the market was in a state of decline during all of calendar year 2009, yet Defendant made no market adjustment for the four months that transpired from the time comparable sale #1 occurred in August 2009 and the applicable assessment date of January 1, 2010. A negative adjustment seems warranted. It has been this court's experience that representative from the Multnomah County Assessor's office routinely mentioned a declining market when a taxpayer presents a post-assessment date sale as evidence of value on an assessment date several months earlier than the date of the purchase. The court has heard similar arguments from other assessor's offices.
The court believes that the evidence shows an error in the record assessment. Reviewing the evidence as a whole, the court concludes that the value of the subject property was $75,000 on January 1, 2010. Defendant's representative Babcock advised the court that there would be a tax savings if the RMV for the property were reduced to at least $83,885. That information is important in determining whether Plaintiff is aggrieved, a statutory requirement under ORS 305.275. Given the court's determination that the RMV of the subject property was $75,000 on January 1, 2010, Plaintiff is aggrieved. *Page 9 
 III. CONCLUSION
The court concludes that Plaintiff presented a prima facie case that there was an error in the record assessment, and that the preponderance of the evidence shows that a reduction in the real market value of the subject property is warranted. The court has carefully considered the evidence presented, both Plaintiffs purchase price and Defendant's appraisal, and, combined with the testimony presented at trial, has determined that the real market value of the subject property, assessor's Account R575139, was $75,000 on January 1, 2010. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is granted in part and the real market value of the subject property for the 2010-11 tax year was $75,000.
Dated this ____ day of November 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Dan Robinsonon November 23, 2011. The Court filed and entered this documenton November 23, 2011.
[1] All references to the Oregon Revised Statutes (ORS) are to the 2009 edition.
[2] An administrative rule promulgated by the Oregon Department of Revenue instructs that the three approaches to value — sales comparison, cost, and income — be considered in determining a property's value, but recognizes that all three approaches may not be applicable in a given case. OAR 150-308.205-(A)(2) (2009). Because the subject property is owner occupied and does not generate any income, neither party used the income approach in valuing Plaintiff's property. Because land value is at issue, the typical methodology prescribed by the cost approach is not relevant.
[3] The reason the court assumes the discrepancy is due to a simple mathematical error is that for each sale, the report includes the "net adjustment" directly above "adjusted] sale price," and it appears as though Burell simply added the $3000 size adjustment to the $3000 net adjustment to arrive at a $6000 total adjustment to the actual sales price. At least, that seems the simplest and most logical explanation for the apparent error in the appraiser's adjusted sale prices, especially since other of her comparables include the same error.