IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

ANGELA WITKIN )
and ADAM WITKIN, )
)
       Plaintiffs, ) TC-MD 110460C
)
    v. )
)
LANE COUNTY ASSESSOR, )
)
       Defendant. ) **DECISION**

Plaintiffs appeal the real market value (RMV) of residential property identified as

Account 0723369 (subject property) for the 2010-11 tax year. Trial in the matter was held by

telephone on the morning of January 4, 2012, and continued in the afternoon of January 5, 2012.

Adam Witkin (Witkin), a real estate agent, appeared on behalf of Plaintiffs. Bryce Krehbiel

(Krehbiel), Residential Appraiser III, Lane County Assessor's office, represented Defendant.

Plaintiffs' Exhibits 1-27 and Defendant's Exhibits A-M were submitted without objection.

I. STATEMENT OF FACTS

The subject property is a somewhat oddly configured two-story home originally built in

1962 that sits on 3.78 acres of land on Gimpl Hill Road in Eugene, on the outskirts of town but

within the urban growth boundary. (Ptfs' Ex 1.) The home has three bedrooms and two and

one-half bathrooms, and is theoretically set up for dual living, although the structure suffers from

serious deferred maintenance and other issues that call into question the habitability of the

property. (*Id.*; Def's Ex A at 2.) Witkin testified that Plaintiffs live in a portion of the home.

/ / /

/ / /

/ / /

The main dwelling is approximately 2048 square-feet, and has an attached garage. Above the garage is a second living space 816 square-feet in size. (Def's Ex A at 2.)[1] Plaintiffs purchased the property from a bank following a foreclosure. (Ptf's Ex 1.) The property was marketed by a reputable real estate company, RE/MAX Integrity, and an agent with considerable experience. (*Id.*) The home was first listed for sale on November 19, 2008, for $349,900. (Ptfs' Ex 2 at 1.) Over the course of the listing, at least four offers for prices considerably below the $349,900 list price were withdrawn. On December 12, 2009, Witkin's wife, Angela Witkin, purchased the property for cash (i.e., no lender financing involved) for $168,470. (Ptfs' Exs 1 at 2, 2 at 1.) Witkin testified that he acted as the agent for the buyer and collected the three percent sales commission offered by the seller bank. At the time of the sale, the property was listed for $199,900, roughly $30,000 more than Plaintiffs paid to buy the property. (Ptfs' Ex 1 at 1.)

Witkin testified that the property has a number of problems and is, in all likelihood, not habitable. Witkin testified that there are numerous leaks in the roof that allow water to penetrate the structure. Plaintiffs submitted a bid for the removal and replacement of the roof over the roughly 800 square-foot apartment above the garage, demonstrating a proposed repair cost of $6,500. (Ptfs' Ex 7.) The photographs Plaintiffs submitted into evidence support the testimony about the leaky roof. (Ptfs' Ex 8.) The water intrusion has seriously and extensively damaged the walls and ceiling of the home. (*Id.*) There are also holes in the walls and vinyl flooring; and, an unheated hallway. (*Id.* at 1-6.)

/ / /

---

[1] There is some question about the square footage of the structure. Defendant submitted a detailed diagram showing the configuration and size of the home (including the garage) drawn and calculated after Krehbiel's physical inspection of the subject property. (*See* Def's Ex A at 2.) The RMLS property listing documents submitted by Plaintiffs as Exhibit 1 indicates that the home has a total square footage of 2442. That document also indicates that there are five bedrooms and three bathrooms, whereas Defendant's records indicate that the subject is a three-bedroom, two and one-half bathroom home. (Def's Ex D at 1.)

In addition, the home has asbestos ceiling tiles and fiberglass insulation. The leaky roof creates a particularly vexing problem for the home because it has caused some of the ceiling tiles to fall, exposing the fiberglass insulation. (Ptfs' Ex 8.) The home also has mold. (*See Id.* at 3.) The court notes that it is commonly known that asbestos, fiberglass, and mold are health risks.

Witkin testified that there are also problems with the drinking water, and that they drink bottled water because the existing water supply, which comes from a well, contains arsenic and iron at levels that exceed the allowable contaminant limits for public drinking water. Plaintiffs submitted an independent water quality analysis report, which indicates that arsenic levels are at nine times the allowable limit and iron is at six times the limit. (Ptfs' Ex 6.) Witkin also testified that the iron in the water tends to cause Plaintiffs' clothes to take on an orange tint; out of necessity, Witkin does not own a white shirt. Witkin testified that the water also smells like sulfur, which makes for an unpleasant shower experience, and that Plaintiffs do not even use the water to brush their teeth.

The home's foundation has settled unevenly creating a significant slope requiring repair. (*See* Ptfs' Ex 5 at 1-4.) According to a contract repair proposal, as of February 2009, settling had caused a corner of the home to drop four and one-half inches. (*Id.* at 1.) Plaintiffs submitted photographs that clearly depict that slope. (Ptfs' Ex 8 at 6.) There are also cracks in the foundation and pieces of cinder block missing. (*Id.* at 4.) The contractor estimated the total cost of repairs to address those problems to be between $18,000 and $19,000, and that the work was dependent upon the results of an engineering report and the permitting process, either or both of which could require more extensive repairs. (Ptfs' Ex 5 at 1-2.)[2] Witkin testified that both the

---

[2] The contractor proposes removing and replacing a concrete walkway at a cost of between $1,500 and $2,500, and leveling the home (to remove the existing slope) at a cost of $16,500. The leveling work includes lifting the structure, adding additional piers to stabilize the structure in the area where the sinking has occurred, adding braces and brackets to stabilize the repair work, etc.

contractor's report and the water quality report were done as part of the due diligence process related to earlier withdrawn offers to purchase the subject property.

Witkin offered evidence of several recent sales Plaintiffs believed to be generally comparable to the subject property as support for their requested RMV. (Ptfs' Exs 9; 11; 12; 16; 18; 22; 24; 25.) While Krehbiel attempted to discredit the sale price by showing that it was out of line with normal market transactions.

Defendant did not submit an appraisal report. Krehbiel testified that the final purchase price paid by Plaintiffs was roughly one-half the original November 2008 list price of $349,900. Defendant insists that the purchase price is not reflective of true market value because the bank that was selling the home was likely under some form of duress, having attempted unsuccessfully to sell the home for approximately one year. Krehbiel testified that the RMV for the 2009-10 tax year was reduced by the county board of property tax appeals, at the assessor's recommendation, from $358,789 to $188,686, based on the trended purchase price, and that the value for the year at issue (2010-11) was only increased approximately $12,000. Krehbiel testified that increase, in turn, was based on an inspection of the property that revealed that the home had an attached garage rather than a detached garage, that a breezeway had been converted to living space, and that the county's records contained an error in the identification of the property, indicating that the home was a single-family dwelling when, in fact, it is a multi-family dwelling (referred to by Krehbiel as a "plex"). Krehbiel also testified that there was discovery of additional unidentified buildings.

Krehbiel's testimony focused on the fact that bank owned properties sell for discounts of between 27 and 36 percent. (Def's Exs E at 5; Ex F.)

/ / /

## II.  ANALYSIS

The issue in this case is the RMV of the subject property on the applicable assessment date, which is January 1, 2010.  *See generally* ORS 308.007.[3]  Oregon law defines RMV for property assessment and taxation purposes as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(1).

RMV is to be determined by methods and procedures adopted by the Oregon Department of Revenue (Department) in accordance with certain statutorily enumerated principles.  ORS 308.205(2).  The statutory principles that must guide the Department in its promulgation of valuation methods and procedures require an RMV determination based on "[t]he amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be expected by a seller of property[,]" and require that "[a]n amount in cash shall be considered the equivalent of a financing method that is typical for a property."  ORS 308.205(2)(a)-(b).

While there are three recognized methods for valuing property, the sales comparison approach is generally viewed as most appropriate for valuing residential property.  This is particularly true for older properties because substantial adjustments must be made under the cost approach and if the property is not generating income, the income capitalization approach is inapplicable.[4]  *Ward v. Dept. of Rev.*, 293 Or 506, 511, 650 P2d 923 (1982) (citations omitted).

_____

[3] All references to the Oregon Revised Statutes (ORS) are to the 2009 edition; all references to the Oregon Administrative Rules (OAR) are to the current rules.

[4] An administrative rule promulgated by the Oregon Department of Revenue instructs that the three approaches to value--sales comparison, cost, and income--be considered in determining a property's value, but recognizes that all three approaches may not be applicable in a given case.  OAR 150-308.205-(A)(2)(a) (2009).  Because the subject property is owner occupied and does not generate any income, neither party used the income approach in valuing the subject property.  Because land value is at issue, the typical methodology prescribed by the cost approach is irrelevant.

Under the sales comparison approach, the court looks at arm's length sales transactions of similar property to determine a correct RMV. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003). The has adopted an administrative rule, OAR 150-308.205-(A)(2)(c), which states that "[i]n utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions." "The value of property is ultimately a question of fact." *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

Plaintiff offered evidence of several recent sales believed to be generally comparable to the subject property. (Ptfs' Exs 9; 11; 12; 16; 18; 22; 24; 25.) Plaintiffs further asserted that the subject property's sale price was an accurate reflection of the market, which included an unusually large number of foreclosure sales, at the time of the subject property's sale. However, despite the similar qualities that these properties may share, no two properties are alike, and Plaintiffs did not make any effort to adjust their sales to be comparable to the subject. The court will therefore give very little weight to Plaintiffs' comparables.

By statute, Plaintiffs have the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 394, 737 P2d 595 (1987) (where the Oregon Supreme Court explained that the derivation of the word "preponderance" is Latin in origin and "translates to 'outweigh, be of greater weight.' ").

Burden of proof requires that the party seeking relief (Plaintiffs in this case) provide evidence to support their argument. The evidence that a plaintiff provides must be "competent evidence" of the requested RMV of the property in order to sustain the burden of proof. *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Because Plaintiffs' sales comparisons are not competent evidence of the requested RMV of the property, they have not met their burden.

"[T]he court has jurisdiction to determine the [subject property's] real market value or correct valuation on the basis of the evidence before the court, without regard to the value pleaded by the parties." ORS 305.412. Despite not conducting an appraisal of the subject property, Defendant did identify several comparable sales. (Def's Exs G, H, I, J, K, L, M.) Defendant offered these sales as an attempt to rebut Plaintiffs' assertions about the market's bank foreclosure sales. Unfortunately, like Plaintiffs, Defendant did not make adjustments for any of the many differences between the comparison sales and the subject property, and, thus, the court cannot rely on Defendant's comparisons.

The sale of the subject property can provide a useful indication of the value of the property. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted). In *Kem* the Oregon Supreme Court ruled that "[a] recent sale of the [subject] property * * * is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is *very persuasive* of the market value." *Id*. (citations omitted) (emphasis added). However, in *Kem* it was also "emphasize[d] that a recent sale of the subject property is not necessarily *determinative* of market value and does not foreclose other methods of valuation[.]" *Id*. at 115 (emphasis added); s*ee also Sabin v. Dept. of Rev*., 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res., Inc. v. Dept. of Rev*., 268 Or 410, 415, 521

P2d 324 (1974). The two important considerations are whether the sale was "recent" and whether it was "arm's length." *Kem*, 267 Or at 114.

This court has been reluctant to attach too much weight to foreclosure sales because of the short nature of the sales and the implicit duress or compulsion on the part of the seller, which brings into question whether the transaction was truly at arm's length. *See Brashnyk v. Lane County Assessor*, TC-MD 110308, WL 6182028 (Dec. 12, 2011), citing *Kryl v. Lane County Assessor*, TC-MD No 100192B, WL 1197444 (Mar 30, 2011) (where the court found that the subject property's lengthy listing on the open market adequately dispelled concerns that its purchase price was not indicative of the actual market value of the property). Thus, in certain exceptional cases, a foreclosure sale price may be indicative of the property's actual market price when its sale history is characteristic of a normal arm's-length transaction.

In this case, the December 11, 2009, sale was recent relative to the date of assessment. Plaintiffs purchased the home for $168,470 roughly three weeks prior to the January 1, 2010, assessment date. (Ptfs' Exs 1, 2.) Further, the listing history and Witkin's testimony also confirm that the sale was an arm's length transaction because a reputable agency (RE/MAX Integrity) had listed the property publically for more than a year, and had received at least four withdrawn offers over the course of the listing. (Ptfs' Ex 2.) The sale thus conforms to what case law has identified as the two most important characteristics, adequate time on the market and being an arm's-length transaction, of the reliability of the sale price.

Defendant attempted to discredit the sale price by showing that it was out of line with normal market transactions; Defendant argued that the price reflected what is commonly cited as a "foreclosure discount," that occurs due to some duress on the part of banks. The home needs at least $25,000 ($6,500 for the garage roof, roughly $18,500 for the foundation and sidewalk)

worth of repairs, not including replacing the roof on the main home, which Witkin testified was simply financially unfeasible. Krehbiel brought out on cross-examination that Plaintiffs moved into the home after their purchase without making any repairs. Witkin responded that he felt blessed to have a roof over his head because he experienced periods of homelessness during his childhood. Witkin further testified that he did not believe most people would live in the home; he stated that he and his wife are admittedly somewhat unconventional in their views on adequate living accommodations. The court found Witkin's testimony credible, compelling, and persuasive, and finds that the evidence Plaintiffs submitted buttresses that testimony. The court is of the opinion that the home is, in fact, not habitable in the sense that it cannot possibly meet code requirements. A home with leaks in the roof, holes in the ceiling, walls, and floor, combined with undrinkable water, asbestos and mold, would deter any potential tenant from renting the subject property. Based on the evidence the court finds that the house is a shambles; and, as Witkin testified, it is unlikely that most anyone would live there.

Plaintiffs have established by a preponderance of the evidence that the difference between the purchase price and the listing price accounts for the condition of the house and the necessary repairs needed. As such the court finds that the sale price was reflective of the real market value of the subject property as of the time of sale and as of the assessment date.

### III. CONCLUSION

On the evidence before it, the court concludes that Plaintiffs have proved by a preponderance of the evidence that the real market value of the subject property for the 2010-11 tax year should be reduced. Now, therefore,

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted and that the 2010-11 real market value for the property identified as Account 0723369 was $168,470.

Dated this ____ day of July 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Presiding Magistrate Jill A. Tanner on July 24, 2012.  The Court filed and entered this Decision on July 24, 2012.*