IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CURRIECO/GRANT SMITH LT, )
)
Plaintiff, ) TC-MD 110240D
)
v. )
)
DOUGLAS COUNTY ASSESSOR, )
)
Defendant. ) **DECISION**

Plaintiff appeals the 2010-11 real market value of property identified as Account R44482 (subject property). A telephone trial was held on January 31, 2012. Valynn Currie (Currie), Oregon licensed real estate agent for more than 35 years and owner of the subject property, appeared and testified on behalf of Plaintiff. Steve Gerlt (Gerlt) testified on behalf of Plaintiff. Paul E. Meyer (Meyer), Douglas County Counsel, appeared on behalf of Defendant. Brian Lif (Lif), Registered Property Appraiser III, testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 21, including replacement Exhibit 5, and Defendant's Exhibit A were admitted without objection.

I. STATEMENT OF FACTS

Plaintiff appeals the real market value of the subject property, a 4.26 acre parcel zoned C3 General Commercial improved with a 2,160 square foot office building, a concrete pad available for another office building, and a coffee shop. (Ptf's Ex 3, 5; Def's Ex A-6.) Currie testified that the office building was built in 2000 and is rented to two tenants, Currie's real estate company and the entity, Hideaway Holdings, who sold the building to Plaintiff. (Ptf's Ex 5.) Currie testified that a portion of the building previously rented to Check Cashing has been

/ / /

"vacant for over three years" and the Coffee Shop was "vacant" as of the assessment date and "is currently vacant."

A.  *Plaintiff's purchase*

Currie testified that the real market value of the subject property as of the assessment date was her purchase price of $190,000, evidenced by a bargain and sale deed recorded December 29, 2009.  (Ptf's Ex 2; Def's Ex A-26.)  Currie testified that the subject property was listed for sale by Hideaway Holding on November 24, 2009, for $200,000; she testified that she was the listing agent.  (Ptf's Ex 3.)  Currie testified that because she concluded it was a "good business decision to consolidate her real estate business in one location" and she had listed her "Winston property" for sale, Currie made on offer on November 30, 2009, to purchase the subject property.  Currie testified that her purchase price supports her requested 2010-11 real market value because of the following "defects" in the subject property:  (1) "compaction of the soil in the front and a lot line adjustment is required to do anything out front;" (2) "settling issues;" (3) "building vacancy;" (4) "covenant not to compete;" (5) "a gas station cannot be constructed on the subject property;" (5) "deferred maintenance:" and  (6) "limited use on the south" side of the subject property.

In response to questions by Defendant whether the transaction was an arm's-length transaction, Currie testified that (1) because she bought the building, she did not "take a commission" as a result of listing or selling the subject property; (2) she concluded that she did not need to prepare a "comparative market analysis" (CMA); and (3) she did her own "title search."  Currie testified that the subject property seller's took a $190,000 note payable as payment from her and she is making monthly payments of $1,000, including principle and six percent interest, until January 1, 2030.  (*See* Def's Ex 28.)  Currie testified that she was not

aware if there was any other offers made to the seller and the seller did not make a counteroffer to her offer of $190,000. Currie acknowledged that "so long as the mortgage remains in force," she is required to "keep the buildings now erected, or any which may be erected on the premises insured against loss for damage by fire, with extended coverage to the extent of $120,000 in some company or companies acceptable to the mortgagee [Hideaway Holdings]." (*Id*.) Currie testified that she was a "captive buyer," stating that she was already a tenant and if someone else purchased the subject property, that individual would have the "discretion to set rents that she couldn't afford." Currie testified the subject property was a "good purchase for her company and good sale for Hideaway Holdings; it was the proper thing at the time."

Lif testified that "six days" is not "fair exposure" for a listed property and the transaction between Currie and Hideaway Holdings is not "an arm's-length transaction."

*B. Subject property's land value*

Gerlt, who described himself as an Oregon registered appraiser since 1976 and retired county employee of more than 30 years, testified that the subject property's 4.26 acre land area is allocated .25 acre to the office building, .10 acre to the "concrete slab," .18 acre to the coffee shop and .62 acre to "remaining land." (*See* Ptf's Ex 5.) The parties agree that the excess land, 3.11 acres, has a real market value of $7,775 as of the assessment date. (*Id*.; Def's Ex A-10.) In his separate analysis of the land and building, Gerlt concluded a price per square foot of $4.00 for the land under the office building, $2.50 for the land under the concrete pad, $2.00 for the land under the coffee shop and $1.35 for the remaining land. (Ptf's Ex 5.) Gerlt testified that remaining land should not be valued as "more than $1.34 to $2.00" a square foot. Plaintiff submitted an exhibit entitled "Green/Roseburg/Winston Area Lane Sales and Residuals[,]" listing various sales and indicated land price per square foot ranging from $5.46 to $9.89 and a

listing for "bare land" located in Sutherlin with a listing price of "$1.75 per square foot" and as of "1-13-12 pitched @ $1.32 per sq ft." (Ptf's Exs 4, 20.)

Lif testified that he determined a land real market value of $258,245. (Def's Ex A-10.) Lif testified that he valued all of the subject property's land other than the excess land (3.11 acres) at $5.00 per square foot. (Def's Ex 10.) He testified that the "concrete pad is not on the tax roll." Lif testified that $5.00 per square foot is less than the "Mean ($7.06)" or Median ($6.06)" for the 13 commercial bare land sales he researched. (*See* Def's Ex 12.) He testified that he verified 11 of the 13 commercial bare land sales. Lif testified that Currie is marketing two listings for parcels located close to the subject property for $5.99 per square foot and $7.83 per square foot. (*See* Def's Exs 47-50.) Currie countered that those listings are not reliable indicators of price per square foot because both parcels, "despite extensive marketing[,]" are "still on the market" and "there have been no offers."

C. *Subject property's building value*

Currie and Gerlt testified that the real market value of the subject property's building should not be greater than the $75,600 real market value set by the Douglas County Board of Property Tax Appeals (BOPTA) in its Order, dated March 17, 2011. (*See* Ptf's Ex 1.) In support of their value determination, Currie and Gerlt testified about the building's condition, original cost and referenced sale listings. (*See* Ptf's Exs 6, 10–12, 15-16.)

Lif testified that he determined the "[s]ubject office building replacement cost new via Marshall & Swift valuation for the January 1, 2010 assessment date is $74.29 per square foot or $160,456." (*See* Def's Ex A-8.) In response to questions, Lif testified that the "total cost probably includes local cost multiplier" and he did not verify "construction costs [for a similar property] in the market." He testified that "[a]fter an interior inspection of the office on

January 19, 2011 it was observed that a 20% depreciation adjustment would be fair." (*Id*.) Lif testified that after making a depreciation adjustment, the "depreciated replacement cost of the subject office" would be "$59.43 or $128,369 and very close to the required insured value of $120,000 indicated in the petitioner's trust deed." (*Id*.)

*D. Income approach*

Gerlt testified that using the income approach the building and coffee shop plus the land associated with the income producing building and coffee shop would generate a potential gross income of $19,800. (Ptf's Ex 5.) Lif estimated "actual income" to be $22,440, stating that because "the buyer and seller are the only ones in the office building giving an estimate of rent, I feel that a lease rate of $.75 per square foot would be more accurate for the subject office." (*See* Def's Ex A-13.) Lif computed actual income as follows: "(2160 sq ft X .75/sq ft X 12) + $3,000 ground lease [for the coffee shop]." (*Id*.) In response to questions, Lif testified that he did not "verify lease rents" and he relied on Currie's rents and vacancy rate. Both Gerlt and Lif testified that each person estimated a 15 percent vacancy factor. (*See* Ptf's Ex 5; Def's Ex A-13.) Gerlt testified that he concluded a 40 percent expense factor to account for "tenants who move out" and the owner must continue paying "insurance, electricity" and similar expenses. (*See* Ptf's Ex 5.) Lif testified that he accepted Currie's 25 percent expense factor, referencing Currie's 2010 BOPTA petition. (*See* Def's Ex A-38.)

Gerlt testified that he determined a net operating income of $10,098. (*See* Ptf's Ex 5.) Lif testified that he determined a net operating income of $14,306. (*See* Def's Ex A-13.)

Gerlt testified that he determined real market value using a seven, eight and nine percent capitalization rate. (*See* Ptf's Ex 5.) His computed real market values, ranging from $112,200 to $144,257 excluding the real market value of "land no income received [.10 acre concrete pad and

remaining land of .62 acre.]" (*Id.*) For those two portions of land totaling .72 acre. Gerlt testified that he determined a real market value of $64,904. (*Id.*) Lif testified that he accepted Currie's "going cap rate of 8" percent and computed "an indicated value" of $178,825. (*See* Def's Exs A-13, 38.) To that value, Lif added the "buildable portion [.72 acre]" and "hillside portion" of the land for a "Total Indicated Value" of $343,000 (rounded.) (*See* Def's Ex A-13.)

*E. Market approach*

Gerlt testified that he "verified all sales" that he reviewed and considered numerous listings but did not "make adjustments" to any of the transactions he reviewed. (*See* Ptf's Ex 6, 10–12, 15-16.) He testified that the "sale of the subject property" fell "within" the sales he verified. Gerlt testified that the average sale price per square foot "with land" for the seven sales was $49.71 per square foot and if the "high and low" sales are removed, the average is $52.41. (*See* Ptf's Ex 6.) Lif challenged Gertl's comparables sales, testifying that many of Gerlt's comparable properties were over 4,000 square feet of office space and "anything over 4,000 square feet is not a good comparable" for the subject property that measures 2,160 square feet.

Lif testified that he relied on three sales to compute an office building mean ($53.45 per square foot) and median ($52.04 per square foot) price per square foot. (*See* Def's Ex A-10.) Lif concluded that the subject property's office building's indicated real market value was $115,000 (rounded), using $53.45 per square foot. (*Id.*) To the office building's indicated real market value, Lif added the "indicated value for the subject land" of $258,245 to determine an "estimated value for the subject property of $373,745." (*Id.*) In response to questions, Lif testified that the subject property is a "wood building" and two of these three comparable properties are "concrete block."

/ / /

*F. Reconciliation*

Lif testified that after considering the three approaches he placed the most emphasis on the income approach "for the income generation portion of the property" and to that value he added "the valuation of the excess land via market analysis[.]" (*See* Def's Ex A-14.) Lif testified that his "final value estimate for the subject property for the January 1, 2010 assessment date" was "$343, 000." (*Id.*)

## II. ANALYSIS

At issue in this case is the subject property's real market value for the 2010-11 tax year. Real market value is defined in ORS 308.205(1)[1] as:

> "[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007(2). There are three methods of valuation that are used to determine real market value: 1) the cost approach, 2) the sales-comparison or comparable sales approach, and 3) the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered although all three approaches may not be applicable to the valuation of the subject property). Plaintiff relied on the income approach and considered sales and listings of other properties but made no adjustments to any of the properties. Defendant considered all three approaches. Because Defendant gave little weight to the cost approach and Plaintiff did not consider the cost approach, the court will not discuss the cost approach.

/ / /

/ / /

---

[1] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

A.    *Income approach*

"Any property that generates income can be valued using the income capitalization approach." *NYEI LLC v.Umatilla County Assessor*, TC-MD No 100605D at 19 (Jan 13, 2012), citing Appraisal Institute, *The Appraisal of Real Estate* 447 (13th ed 2008).  "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value.  The principle of anticipation is fundamental to the approach."  The Appraisal of Real Estate at 445.  Anticipation is defined as "[t]he perception that value is created by the expectation of benefits to be derived in the future." *Id*. at 35.

Because the primary use of the subject property is an office building, both parties determined the subject property's real market value using the income approach.  The parties agree on some but not all of the income approach components (gross income, vacancy rate, expense rate and capitalization rate.)

Even though Lif testified that he relied on Plaintiff's income information, Lif estimated a gross income greater than Plaintiff, relying on an estimated rental price per square foot that he did not verify.  Given the subject property's rental history, the court accepts Plaintiff's estimate of gross income, $20,000 (rounded).

The parties agreed that the vacancy rate of 15 percent.  The court accepts the parties' agreed vacancy rate of 15 percent.

The parties agree that the expense rate is 25 percent.  To that expense rate, Gerlt added an additional 15 percent for what he termed expenses associated with "tenant turnover."  Gerlt provided no substantiation for his estimate.  The court accepts the parties' agreed expense rate of 25 percent without adding the additional unsubstantiated tenant turnover rate.

Using a $20,000 gross income reduced for vacancy and expenses, the net operating income is $12,000. To compute a real market value, the net operating income is divided by a capitalization rate. Gerlt suggested three capitalization rates, seven, eight and nine percent. Lif testified that he accepted Currie's "going cap rate of 8 percent." Neither party discussed the inclusion or exclusion of a property tax rate as part of their proposed capitalization rate.

The court concludes that the real market value of the subject property's income producing portion of the property is $150,000, using an eight percent capitalization rate.

Parties agree that to the real market value of the income producing portion of the subject property, the real market value for the .72 acre non-income producing land and excess land identified as "hillside" must be added. The parties agree that the real market value of the excess land is $7,775. (*See* Ptf's Ex 5; Def's Ex A-13.) Gerlt determined for the non-income producing portion of the land the following prices per square foot: $2.50 per square foot for the .10 acre concrete pad site and $2.00 per square foot for the .62 acre "remaining land." (Ptf's Ex 5.) Gerlt offered one June, 2011, listing for an 8.66 acre parcel located in Sutherlin, Oregon that is currently on the market in support of the prices per square foot of comparable bare land. (Ptf's Ex 4.) That parcel is advertised as a "property fire sale" and states that an "adjoining non-dev. parcel recently sold for $4.70 / SF." (*Id.*) The court places no weight on a "fire sale" for a parcel that is approximately eight times larger than the portion of the subject property that is being valued. Gerlt submitted a summary of land sales, ranging from an indicated land price per square foot of $5.46 to $9.89. (Ptf's Ex 20.) Lif determined $5.00 per square foot for the non-income producing portion of the land. He submitted a summary of commercial bare land sales with median price per square foot of $6.06 and a mean price per square foot of $7.06. (Def's Ex

///

A-12.)  Given Plaintiff's and Defendant's evidence of commercial bare land sales, the court concludes that Defendant's price per square foot of $5.00 is reasonable.

The court concludes that the real market value of the income producing portion of the subject property ($150,000), the excess land ($7,775) and the remaining land ($156,816) combine for an indicated real market value of $314,591 for the subject property as of the assessment date.

*B. Comparable sales approach*

The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001).  ORS 308.205(2) provides in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]"  The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating in part that:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

Plaintiff's comparable sales approach was incomplete because none of the selected properties were "adjusted to be comparable" to the subject property.  OAR 150-308.205-(A)(2)(c).  Plaintiff's submitted property listings with no adjustments for size, location, time, condition or other similar distinguishing features.  Gerlt selected comparable income producing properties that offered rentable space significantly larger than the subject property and those properties that offered similar rentable space were sold at prices per square foot substantially more than he concluded for the subject property.  (Ptf's Ex 6.)

Defendant's determination of real market value using the market comparison approach relied on "office building sales residuals[.]" (Def's Ex A-10.) Lif selected three sales, one sale occurring four months prior to the assessment date and two sales occurring three and one-half months and 16 months after the assessment date. Lif provided pictures of the three sales, but no detailed listing of the building characteristics. Like Plaintiff, Defendant's comparable sales approach was incomplete because none of the selected properties were "adjusted to be comparable" to the subject property. OAR 150-308.205-(A)(2)(c).

Given the incomplete evidence submitted by the parties, the court places little weight on the comparable sales approach.

C. *Purchase Price*

To determine real market value, Plaintiff relied primarily on the purchase price paid for the subject property approximately one month prior to the assessment date. When determining real market value, the sale price of a recent, voluntary, arm's-length sale of property between a willing and knowledgeable buyer and seller is also very persuasive of real market value, albeit, not conclusive. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973); *see also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether or not the sale was "recent" and whether it was "arm's length." *Kem*, 267 Or at 114-115.

Plaintiff's purchase, which closed on November 30, 2009, was close to the January 1, 2010, assessment date, making it a recent sale prior to the assessment date.

In considering a sale, the next issue is whether the sale was an arm's-length transaction. Plaintiff alleges that this transaction was an arm's-length transaction. The court disagrees. Currie, Plaintiff's representative who has been a licensed real estate broker for more than 35

years, listed the subject property for sale and then six days later offered $10,000 less than the listing price and the seller accepted Currie's offer without a counter offer. Currie was a tenant in the subject property's office building and the seller was the landlord and tenant; now the seller is a tenant and Currie is the landlord and tenant. Currie testified that no cash was given to the seller; she gave a note payable in 20 years to the seller. Given the short time period (six days) that the property was listed, the purchase by the listing broker, Currie, for five percent less – an amount equivalent to the selling commission Currie waived – than the listing price, the known business relationship between the seller and Currie and the seller agreeing to carry a 20 year note for 100 percent of the purchase price, the court concludes that this transaction was not an arm's-length transaction. The court cannot rely on this one transaction to determine the subject property's real market value.

### III. CONCLUSION

After careful consideration of the evidence, the court concludes that the only reasonable evidence before it to determine real market value is the income approach. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

IT IS DECIDED that the real market value of the subject property identified as Account R44482 as of the assessment date, January 1, 2010, was $314,600.

Dated this ___ day of April 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*
*This document was signed by Presiding Magistrate Jill A. Tanner on April 9, 2012. The Court filed and entered this document on April 9, 2012.*